# WESTPARK, INC. *v.* SEATON LAND COMPANY ET AL.

[No. 224, September Term, 1960.]

434

*Decided June 9, 1961.*

The cause was argued before BRUNE, C. J., and PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*Melvin J. Sykes,* with whom were *C. M. Zacharski, Jr.,* and *Joseph I. Huesman* on the brief, for the appellant.

*Edward F. Shea, Jr.,* with whom were *Theodore Sherbow, William A. Agee* and *Sherbow & Sherbow* on the brief, for Seaton Land Company, one of the appellees.

*Z. Townsend Parks, Jr.,* with whom were *H. Emslie Parks* and *William M. Travers* on the brief, for the Cooks, part of the appellees.

No brief and no appearance for Russell T. Baker and Company, an appellee.

SYBERT, J., delivered the opinion of the Court.

In this appeal we are called upon to determine which of two development corporations has the paramount right to purchase certain land in Baltimore City from the owners, Joseph P. Cook and Herman F. Cook, Jr., and their wives, appellees. The appellant, Westpark, Inc., claims on the basis of its exercise of a right of first refusal contained in an agreement executed by the Cooks in 1954, while Seaton Land Company, one of the appellees, claims under a contract of sale

signed by the Cooks in 1958. The Circuit Court of Baltimore City decreed specific enforcement of the Seaton contract and dismissed Westpark's cross bill seeking similar relief, or, in the alternative, money damages. Westpark appealed.

The Cooks owned several parcels of land on Cooks Lane, near Edmondson Avenue, in the western section of the city. Joseph Cook and his wife live at 703 Cooks Lane, a lot 120 feet square, which they own. Herman Cook and his wife own and live at 713 Cooks Lane, containing one acre. Joseph and Herman are brothers. Their maiden aunt, Belle Cook, owned and lived on 5.2 acres, known as 709 Cooks Lane, located between the brothers' lots. Those three properties are the subject of these proceedings. In addition, Joseph and Herman, in 1954, owned 12.04 acres of undeveloped land on Cooks Lane north of and adjoining the other properties.

The involved factual situation leading to the present litigation originated with an agreement on April 8, 1954, between the Cooks and George J. Miller, Jr., Builder, Inc., concerned primarily with the 12.04 acre tract. This tract had been in the hands of a real estate broker for sale for some time, without success. Its topography was difficult and rocky, with an open stream at the bottom of a deep ravine, making the feasibility of development problematical. George J. Miller, Jr., an officer of the corporation bearing his name, became interested in the tract and discussed it a number of times with the Cook brothers. Realizing that a considerable expenditure of money and effort would be necessary to determine whether development was practicable, the parties worked out an option agreement under which the Miller company was to have 90 days in which to purchase the 12.04 acres at a price ranging from $37,000 to $40,000, depending upon the number of houses that could be built thereon. In consideration of the option, the Miller company agreed to pay the costs of a topographical survey and an engineering study, with the condition that if the option was not exercised, the results of the survey and study would be delivered to the Cooks upon reimbursement to the Miller company for the cost of the survey alone, not to exceed $600.

Miller was also interested in Belle Cook's adjoining 5.2 acres. This land was closer to Edmondson Avenue, a main traffic artery, was free of topographical difficulties, and would be relatively inexpensive to develop. However, Miss Cook, then 76 years of age, desired to end her days there, so it could not be developed as long as she lived on it. On the other hand, Miller foresaw the possibility that his company would develop the more difficult and expensive 12.04 acres, but that some late comer might take over the 5.2 acre tract, whose value would be enhanced and development facilitated by his company's improvement of the 12.04 acres.

During negotiations for the option on the brothers' 12.04 acres, Miller requested an option on Belle Cook's 5.2 acres. In discussion between the Cook brothers, their attorney, and Miller, it was pointed out that an option at a fixed price would be unfair if the value of the land should increase, as seemed likely. Finally, the parties agreed to include in the option agreement relating to the 12.04 acres, a right of first refusal as to the 5.2 acres, under which the Miller company would for five years have the right to meet any price and terms acceptable to the Cooks should they decide to sell the property. The right of refusal provision became paragraph 10 of the April 8, 1954 agreement and read as follows:

"10. The parties hereto hereby now agree that the Buyer shall have the 'right of refusal' with respect to the following described property, to wit: — All other land presently owned by the signatories hereto between Cooks Lane and the west side of Hunting Ridge and Edmondson Avenue, exclusive of the residence of Joseph P. Cook and Herman F. Cook, this 'right of refusal' herewith given the Buyer shall be construed to mean that if the owners of the aforedescribed property shall at any time within five (5) years from the date of this Option Agreement decide to sell the property hereinabove described in this paragraph, they shall, before selling it to any other party or person, give the Buyer herein written notice of their intention to so sell the property and

of the price for which they intend to sell it, and the terms thereof, the Buyer herein shall have seven (7) days from the receipt of such written notice to accept such offer."

The effect of the description of land in paragraph 10 was to include only Belle Cook's 5.2 acres, since Joseph's and Herman's residence lots were excluded. She executed the agreement, along with the other parties, above a notation stating that she "signed this Agreement to indicate her intention to be bound by the 'right of refusal' set forth in paragraph 10 hereof since she is presently the owner of the land described in said paragraph". Belle Cook had raised the Cook brothers after their mother's death in their early childhood, and the record shows that she did not hesitate to execute the agreement in order to facilitate the possible sale by her nephews of their 12.04 acres.

It proved impossible to complete the topographical survey and engineering study on the 12.04 acres within the 90 day limit provided in the option, and consequently the parties executed an agreement extending the option for an additional 30 days. Belle Cook signed the instrument, which contained a notation that she did so to indicate her intention to be bound by the extension and by the right of refusal set forth in paragraph 10 of the original option.

George J. Miller, Jr., Builder, Inc., assigned the option agreement on August 4, 1954, to the appellant, Westpark, Inc., of which Miller is vice-president. On the next day the Cooks and Westpark entered into a supplemental agreement substituting Westpark for the Miller company as a party to the original option agreement. Belle Cook also executed this agreement, with a notation similar to that mentioned in the preceding paragraph.

Westpark exercised the option on the Cook brothers' 12.04 acres by paying a purchase price of $40,000 and receiving a deed. From 1954 to 1957 Westpark built 15 detached, 52 semi-detached, and 15 group houses on this tract. It paid half the cost of streets and the whole cost of sanitary sewers draining the area, and dedicated them to Baltimore City, as

required by city regulations. There was testimony to the effect that the improvements and utilities installed on the 12.04 acre development by Westpark increased the value of Belle Cook's 5.2 acre tract and made it easier to develop. Miller testified that "* * * at the time we made the agreement [of April 8, 1954] we wouldn't have taken the 12-acre tract without the * * * right of refusal on the 5-acre tract and I can state that quite emphatically."

In 1956 Belle Cook conveyed the 5.2 acres to Joseph and Herman Cook as a gift. She died in 1957, and somewhat later the Cooks listed the tract with a realtor for approximately one year, with no results. Miller testified that the reason for this listing was to ascertain the market value of the property and to sell to Westpark if it met the price offered, and, if not, to sell to the offeror. In 1957, St. William's Church, part of whose property is directly across Cooks Lane from the 5.2 acres, became interested in acquiring the property and was informed by the Cooks of Westpark's right of refusal. In late 1957 and early 1958 Miller surveyed and staked the 5.2 acres and laid out a street with a view to development. Later in 1958 Miller and Herman Cook discussed a joint venture for the construction of apartments, Miller to contribute the building and Cook the land. Joseph Cook was not interested in this proposal, and Herman did not see his way clear to purchase his brother's interest in the land, but discussions between Miller and Herman continued on into September.

On September 11, 1958, the Cooks listed the 5.2 acres for sale with Russell T. Baker and Company, a corporate realtor, through Richard M. Larrick, a Baker company salesman, who was a friend of the Cooks. Miller was in the home of Herman Cook on the evening of September 11, discussing the apartment venture, when Larrick arrived to obtain the listing. Miller testified he remained only a few minutes thereafter and said nothing to Larrick concerning Westpark's right of refusal, but stated that Herman Cook told him he would disclose Westpark's interest, and that he relied on it, as on past occasions. Both Cook brothers and Larrick testified that

on that same evening the Cooks told Larrick of Westpark's right of refusal and the details thereof. Larrick discussed the right of refusal with his sales manager, and on the request of the latter the Cooks had their attorney send a copy of the 1954 option agreement to the Baker company.

Larrick advertised the 5.2 acres for sale and received a call from Robert Meyerhoff, president of appellee, Seaton. Larrick showed the property to Meyerhoff, and later to his assistant, Trivas, and Larrick and Herman Cook testified that shortly thereafter an offer of $40,000 was received from Seaton on the 5.2 acres, although Meyerhoff stated that to his recollection no offer was made on that tract alone. Mr. and Mrs. Herman Cook then decided to sell their home also, and Seaton made an offer on both properties. Thereupon Mr. and Mrs. Joseph Cook likewise determined to sell their home, and Larrick was asked to try to sell all three properties. No listing agreement was ever signed, except the original one for the 5.2 acres.

An offer of $80,000 was made by Seaton for the three properties by tendering a standard printed form of contract of sale, prepared by Seaton's counsel, into which he had inserted the following clause:

> "It is agreed that if Vendee shall default in paying the balance of the purchase money in accordance with the terms of this agreement, Vendors shall retain all money theretofore paid hereunder as liquidated damages for the breach of contract, and shall not have any right of action against Vendee arising out of this agreement either at law or in equity."

The price of $80,000 was not acceptable to the Cooks. Both brothers testified that they wanted $50,000 for the 5.2 acres, that Herman wanted $20,000 for his home and Joseph wanted $18,000 for his. Larrick was informed that they would not take less than $88,000 for the three properties, and he so advised Meyerhoff, who thereupon stated that Seaton would pay that figure.

Larrick struck out the price of $80,000 in the contract pre-

pared by Seaton's counsel, inserted $88,000 instead, made
other necessary changes, and took the contract to the home
of Herman Cook late on the night of Tuesday, October 28,
1958, for signature and initialing of the changes. Herman tes-
tified that Larrick assured him that "everything was all right,"
but that he said to Larrick, "you know this may not be good
for me to do this because Mr. Miller [Westpark] has the
right of refusal", and that Larrick replied, "I know that".
Larrick had Joseph Cook and his wife sign the contract on
the next day. Joseph testified that before he signed he told
Larrick "Don't forget to notify Miller," and asked, "Is every-
thing all right now before I sign it?" and that Larrick re-
plied, "Yes, everything is all right." Joseph then added, "Be-
cause you know George [Miller] has to be notified," and he
was "pretty sure" that Larrick said "Everything is taken
care of."

The contract of sale was dated October 28, 1958. As soon
as the Joseph Cooks executed it on the 29th, Larrick had it
signed by Seaton's officers and left an executed copy with
that company, after receiving the $2,000 deposit required
therein. It is conceded that up to this point Seaton had no
knowledge of Westpark's right of refusal under its option
agreement of April 8, 1954.

In his testimony, Larrick admitted that on the evening
when he obtained the listing of the 5.2 acres, the Cooks told
him of Westpark's right of refusal; that the Baker organiza-
tion, on request of its sales manager, had obtained a copy
of the 1954 option agreement and kept it in its file on the
Cook property; that he was in touch with the sales manager
in every step of the Cook transaction; that he and the Cooks
had discussed the right of refusal several times; that the Cooks
impressed on him that they were obligated to notify West-
park as to any proposed sale; that he knew that under the
option agreement Westpark had seven days to meet the price
offered by anyone else; that he had acted "too hasty" in de-
livering the executed contract of sale to Seaton; that the
reason had been that he wanted to make a sale, and that he
thought the disclosure of Westpark's right of refusal would

have caused difficulty in making a sale. He asserted that the Cooks gave him no instructions as to how to handle the transaction when they signed the contract, and that after an earlier statement by Herman Cook that he didn't think Miller (Westpark) was in a position to take up the option, "* * * I just went on the assumption that he was not interested in the property."

The record shows that after the contract of sale was delivered to Seaton, Larrick discussed the situation with his sales manager, who contacted the Baker organization's counsel. On advice of the latter, the sales manager called Seaton on October 30 and notified it of Westpark's right of refusal. Meyerhoff consulted Seaton's counsel, who checked the land records, found that the right of refusal had not been recorded, and advised that the Seaton contract should be acknowledged and recorded promptly. Larrick took Trivas, who was also a notary public, to the Herman Cook home, where the four Cooks acknowledged the instrument. The Cooks were not informed of the real reason for the visit, Larrick merely telling them that Seaton was a stickler for detail and just wanted to make sure that the signatures on the contract were theirs. The Seaton contract was filed for recording among the land records on the morning of October 31.

Larrick also told Herman Cook that he had better inform Miller of the Seaton contract. Cook did so on the night of October 29. He said that Miller seemed to be interested, and asked for a copy of the Seaton instrument. Miller testified that on that evening Cook gave him the breakdown of the sale price—$50,000 for the 5.2 acres and $20,000 and $18,000 for the two residences. On the next day Larrick informed the Cooks that the notice to Miller must be in writing, and a letter, dated October 30, 1958, and postmarked on October 31, was mailed to Miller and was received by him on November 1. It read as follows:

"We have a contract dated October 28, 1958 for 703, 709, and 713 Cook's Lane for

"Eighty-eight Thousand ($88,000.00) ...Dollars of which Two Thousand ($2,000.00) ....Dollars

have been paid prior to the signing hereof and the balance to be paid as follows: Five Thousand dollars ($5,000.00) in cash sixty days after the date hereof, and the remaining balance, that is, Eighty-one thousand dollars (81,000.00) in cash, at settlement, which shall take place ninety days after the date hereof, provided that Vendee shall have the right to settle at any time prior to said ninety days upon paying in cash the entire balance of said purchase price."

At the trial, counsel for the Cooks informed the chancellor that the purpose of the letter was to give Westpark an opportunity to exercise its right of refusal under its option agreement. Miller received a copy of the Seaton contract on November 3, and two days later delivered to Joseph Cook, and mailed to Herman Cook, a letter whereby Westpark informed the Cooks of its exercise of its right of refusal as to the 5.2 acres. The letter also stated that, since the Cooks' letter of October 30 had offered all three properties to Westpark for $88,000, "We also hereby accept your offer to sell so much of the said property, as is not subject to our 'right of refusal', that is, the residences of Joseph P. Cook and Herman F. Cook * * *". With the letter, Westpark forwarded to the Cooks a contract containing price and terms identical with the price and terms of the Seaton contract, including the special clause relating to remedies upon default by the purchaser. Miller testified that his purpose was to duplicate exactly the Seaton contract. A check for deposit of $2,000 was enclosed with the letter. At the trial, Miller testified that Westpark is ready, able and willing to purchase the 5.2 acres at $50,000, the valuation placed by the Cooks upon that tract separately, or to purchase all three properties at $88,000.

In their answers to the bill of Seaton and the cross-bill of Westpark, in their testimony, and in their brief here, the Cooks take no position in the controversy between Seaton and Westpark as to which is entitled to the property in question, but "stand ready, willing and able to convey said property as the Court directs." Asserting that they had been placed in their present position by the action of the Baker

company, through its agent, Larrick, the Cooks impleaded the Baker company as a defendant so that it could be held responsible for any damages which might be assessed against the Cooks.

In the situation thus presented, the learned chancellor entered a decree denying Westpark's claim for equitable relief or damages, and specifically enforcing a conveyance of the three Cook properties to Seaton. In his opinion, the chancellor held (a) that the condition upon which Westpark's right of refusal was contingent, namely, an agreement to sell only the parcel to which the right attached, had not occurred; (b) that Seaton's equitable title to the property was prior in time to any equitable interest of Westpark; (c) that the equities were with Seaton by reason of its good faith and lack of notice and because of Westpark's lack of diligence in protecting its rights; and (d) that Westpark's proof of damages was too speculative and uncertain to form the basis of a decree for money damages. Seaton also contended below that no consideration had passed to Belle Cook for her grant of the right of refusal as to the 5.2 acres, but the chancellor concluded it was unnecessary to pass upon that question in view of his finding against Westpark.

As was observed by the chancellor, the issue presented in this case appears to be one of first impression in Maryland. Indeed, it seems to have been before the courts elsewhere infrequently, and uniformity of solution has not resulted.

In the case of *Barranco v. Kostens*, 189 Md. 94, 97, 54 A. 2d 326 (1947), this Court stated the general principles governing the granting or withholding of the equitable remedy of specific enforcement of contracts, as follows:

> "It has been broadly stated that the extraordinary remedy of specific performance is not a matter of right in either party, but is a matter of discretion in the court. This discretion, however, is not an arbitrary or capricious discretion, but a sound and reasonable discretion, which is governed as far as possible by established principles of equity, and which

grants or withholds relief according to the circumstances of each particular case when the established principles do not furnish any exact measure of justice between the parties. * * *"

See also *Nat. School Studios v. Mealey,* 211 Md. 116, 126 A. 2d 588 (1956), and 3 Pomeroy, *Equity Juris.,* 5th ed., § 860.

The application of equitable considerations and good conscience are especially called for in a case such as the one before us, where expensive, time-consuming litigation between two innocent parties has been caused by the nondisclosure of a material fact.

The principal question in this case involves the relative merits of the equities claimed by Westpark and Seaton, with respect to the parcels of land mentioned. As an aid in determining this question, Pomeroy has provided a general guide: " '* * * In examining into the relative merits (or equities) of two parties having adverse equitable interests, the points to which the court must direct its attention are obviously these: the nature and condition of their respective equitable interests, the circumstances and manner of their acquisition, and the whole conduct of each party with respect thereto. And in examining into these points, it must apply the test, not of any technical rule, or any rule of partial application, but the same broad principles of right and justice which a court of equity applies universally in deciding upon contested rights.' " 2 Pomeroy, *Equity Juris.,* 5th ed., § 414.

Under a right of refusal such as that contained in paragraph 10 of the 1954 agreement between the Cooks and the Miller company, Westpark's assignor, Professor Corbin says that no immediate option to buy is created, but the promisee is given the right that, before the owner shall sell to any third party, the promisee shall have an option to buy at the price offered to or offered by the third party. 1 Corbin, *Contracts,* § 261. The promisee has a contractual right that the owner should give him such an option to purchase, or to refuse to do so, before selling to anyone else. *Ibid.* The option, if exercised, ripens into a contract for the purchase of

the property. We think, therefore, that the right of refusal involved here gave Westpark what might be termed an equitable right with respect to the land therein mentioned.

On the other hand, Seaton's interest arises under an instrument in the form of a standard executory contract of sale, with the special clause added thereto by Seaton's counsel limiting the remedy of the Cooks to retention of deposit monies theretofore paid, as liquidated damages, if Seaton should default. Westpark contends that, under *Messina v. Moeller,* 214 Md. 110, 133 A. 2d 75 (1957), the special clause converted the Seaton document to an option. We find it unnecessary to discuss that question since we do not think the case turns on that point.

The general rule is that a purchaser of real estate takes subject to outstanding equitable interests in the property, which are enforceable against him to the same extent they are enforceable against the vendor, where the purchaser is not entitled to protection as a bona fide purchaser, 55 Am. Jur., *Vendor and Purchaser,* § 651; 51 Ann. Cas. 1918C, 456; and one who purchases the equitable title to real estate is not protected as a bona fide purchaser where he receives notice of a prior equity before he acquires the legal title, 51 Ann. Cas. 1918C, 457; 55 Am. Jur., *Vendor and Purchaser,* §§ 652, 693; 4 *American Law of Property,* § 17.10; or where he receives notice before he has paid all or substantially all of the purchase price. 3 Pomeroy, *Equity Juris.,* 5th ed., § 750; 55 Am. Jur., *Vendor and Purchaser,* § 747; 5 Tiffany, *Real Property,* 3rd. ed., § 1304; James, *Option Contracts,* § 515; 124 *A.L.R.* 1259, 1261; 109 *A.L.R.* 163, 166. Since the early case of *Price v. McDonald,* 1 Md. 403, 422 (1851), it has been settled law in Maryland that "[n]otice prior to the payment of the purchase money, will bind a party, as effectually as if he had received it before his purchase." In that case this Court found that the purchaser of real estate acquired notice of a prior equity before paying the purchase price, and that therefore the prior equity prevailed.

In our view of the case before us, Seaton is not entitled to protection as a bona fide purchaser of the 5.2 acre tract,

since it received notice of Westpark's equity before paying any except a small portion of the purchase money and before acquiring legal title, and therefore it is bound by that outstanding right. From the text writers and annotators mentioned above, and the cases cited by them, it would appear to be immaterial whether the notice of a prior equity was acquired before or after execution of the instrument under which the subsequent purchaser claims, so long as such notice was received before the subsequent purchaser paid the purchase money or obtained the legal title. Such also is the effect of the ruling in *Price v. McDonald, supra.* Cf. *Blondell v. Turover,* 195 Md. 251, 72 A. 2d 697 (1950), and *Thistle Mills Co. v. Bone,* 92 Md. 47, 48 Atl. 37 (1900).

The rule laid down in *Price v. McDonald* is cited in § 747 of 55 Am. Jur., *Vendor and Purchaser.* The text writer then states, "This rule has been placed upon the ground that the equity of the bona fide purchaser arises not out of his mere lack of notice, but out of an injury to him through an innocent change of position to his prejudice, and that where the payment remains executory, there is no irrevocable change of position." To the same effect see *La Fon v. Grimes,* 86 F. 2d 809 (5th Cir. 1936), 109 *A.L.R.* 156, and annotation at 109 *A.L.R.* 163. Here, the record reveals no change of position to the detriment of Seaton in the day or two which elapsed between the delivery of its contract and the receipt by its officers of notice of Westpark's equity. As to the $2,000 deposit paid to the Cooks by Seaton, the general rule in this country is that where the subsequent purchaser has paid part of the purchase money before receiving notice of the prior equity, he will be protected to the extent of the amount paid. 92 C.J.S., *Vendor and Purchaser,* § 323 d. (1); 5 Tiffany, *Real Property,* 3rd ed., § 1305; 124 *A.L.R.* 1261. In application of the rule, it is said that the court may make a provision in its decree either making the return of the money paid by the subsequent purchaser before notice a condition precedent to any relief at all, or declare a lien therefor on the land. 55 Am. Jur., *Vendor and Purchaser,* § 750.

Seaton contends that Westpark was negligent in failing to

take steps to protect its contract rights, particularly when it knew that the 5.2 acres were being listed for sale with the realtor, and in failing to have its option agreement recorded among the land records. While Miller was present in Herman Cook's home for a few minutes after Larrick arrived to obtain the listing agreement, he testified that he relied upon Cook to inform Larrick of Westpark's right of refusal, as had been done the year before when St. William's Church showed interest in the property, and the record reveals that both Larrick and his employer received prompt and full notice of Westpark's right. From the nature of the right of refusal in this case, Westpark was under no obligation to make an offer to the Cooks, but was entitled to rely upon the Cooks' contractual obligation to afford it an opportunity to meet any acceptable offer made by another. 51 C.J.S., *Landlord and Tenant*, § 80; *Cortese v. Connors*, 135 N. E. 2d 28 (N. Y. 1956).

We see no merit in the argument that Westpark should have recorded its agreement. Contracts for the conveyance of real estate, or any interest therein, are not required to be recorded by our recording statutes, although Code, Art. 21 § 26, permits them to be recorded if they have been executed and acknowledged in the same manner as deeds. It has not been the custom in this State to record such contracts, and Seaton, itself, did not have its contract acknowledged and recorded until after it received actual notice of Westpark's equity. Moreover, the record shows that Seaton made no examination of the land records before executing its own contract, so it is difficult to find that it was prejudiced by the fact that Westpark's instrument had not been recorded.

Seaton also alleges a lack, or at least an insufficiency, of consideration for Westpark's right of refusal. The contention is that the 1954 agreement recites as consideration for the option on the 12.04 acres the performance of a topographical survey and an engineering study, and that the optionee was to be reimbursed for costs of the topographical survey if it failed to exercise the option. Seaton argues that this was a promise without obligation or detriment on the part of Westpark's

predecessor, or benefit to the Cooks, and therefore illusory. This argument overlooks the fact that Westpark's predecessor was not to be reimbursed for the engineering study, and would itself as a developer expend considerable time, effort and money in determining the feasibility of developing the land to the profit of the Cooks. "An agreement to render services which the promisee is not bound to render, independent of the contract, is a sufficient consideration." *Ledingham v. Bayless,* 218 Md. 108, 115, 145 A. 2d 434 (1958). As this Court said in *Shriver v. Druid Realty Co.,* 149 Md. 385, 131 Atl. 815 (1926), at page 390: "The rule universally recognized is that parties of sound mind and under no legal disabilities, not occupying fiduciary relations, are left free to make such contracts as to them seem wise, and neither courts of law nor equity will interfere to reform or rescind such contracts, when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist. * * *" See also *Straus v. Madden,* 219 Md. 535, 150 A. 2d 230 (1959).

Seaton also makes the point that no consideration passed to Belle Cook to support her grant of the right of refusal on her 5.2 acres. Without discussing the good consideration of her love and affection for her nephews and her desire to aid them in disposing of their difficult 12.04 acres, the development of that tract would enhance the value of her adjoining parcel and afford consideration to her. Moreover, this Court has stated that consideration need not be given to the promisor, it being sufficient if given to another person. *Swift v. Allan,* 211 Md. 588, 128 A. 2d 260 (1957). In any event, the Cook brothers were parties to the grant of the right of refusal on Belle Cook's property. Their later acquisition of title to the property estops the brothers, who did receive consideration, from repudiating the grant, as well as Seaton, which claims through them. *Columbian Carbon Co. v. Kight,* 207 Md. 203, 114 A. 2d 28 (1955).

Bearing in mind the principles enunciated in *Barranco v. Kostens,* 189 Md. 94, and in 2 Pomeroy, *Equity Juris.,* 5th ed., § 414, both *supra,* with respect to the discretionary ap-

plication of the extraordinary remedy of specific performance, and being governed by "the same broad principles of right and justice which a court of equity applies universally in deciding upon contested rights," we conclude that the equity of Westpark is at least equal, if not superior, to that of Seaton as to the 5.2 acre tract, under the facts and circumstances of this case. We reach that result after consideration of Miller's unwillingness to undertake development of the considerably more expensive and relatively unattractive 12.04 acre tract without at least the possibility of recouping by later development of the more profitable and attractive 5.2 acres; Westpark's successful development of the larger tract, including installation of utilities, streets and storm sewers up to the edge of the smaller tract, resulting in the actual enhancement of the value of the smaller tract; the circumstances surrounding the execution and delivery of the Seaton contract (without any fault on the part of Seaton); the fact that Seaton has not suffered any detriment, and all other factors in the record. It is a familiar equitable rule that as between equities otherwise equal, he who has the prior equity in point of time is entitled to a like priority in point of right. *Treiber v. Lanahan*, 23 Md. 116, 134 (1865); 19 Am. Jur., *Equity*, § 486.

On the facts before us, we think that the letter from the Cooks to Westpark giving notice of the Seaton contract, along with other factors, mount up to a new offer to Westpark of the three tracts for $88,000. Westpark so considered it, and, in its reply to the Cooks, after giving notice of its exercise of the right of refusal on the 5.2 acres (thereby avoiding abandonment of the priority of its right of refusal), it accepted the offer of the other two tracts at the total price for the three parcels of $88,000, the breakdown on which had been given to Miller by Herman Cook a few nights before. In view of the position taken by the Cooks in the case, as evidenced by their answers filed, their testimony, and their brief, we hold that Westpark has not only a valid contract of purchase on the 5.2 acres, but also a contract of purchase as to the other two parcels, subject, as to the latter, to Sea-

ton's prior contract, all at the respective prices assigned by the owners in their testimony. Seaton should be given an opportunity to determine whether it desires to consummate the purchase of the two lots. When a vendor is unable to transfer title to all of the land that he contracted to transfer, the vendee, if he so desires, may seek specific performance with respect to the balance. 5 Corbin, *Contracts,* § 1160. See also 2 Pomeroy, *Specific Performance of Contracts,* 3rd ed., § 434. The performance that the decree requires need not be identical with that promised in the contract. The court may decree specific performance conditionally. *Brooks v. Towson Realty, Inc.,* 223 Md. 61, 73, 162 A. 2d 431 (1960).

While it has been pointed out that Westpark's cross-bill of complaint did not contain a prayer for a conveyance of all three properties, the cross-bill, as well as Westpark's answer to Seaton's bill, did claim a right to a conveyance thereof. The cross-bill contains a prayer for general relief. "Under the prayer for general relief the Court is not confined to what may be specially asked, but may adapt the relief to the nature of the case as stated in the bill * * *". *Phillips Co. v. Md. Broadcasting Co.,* 184 Md. 187, 197, 40 A. 2d 298 (1944).

The case will be remanded for the passage of an order requiring the Seaton Land Company to file with the court, within ten days after service of the order, its election to complete the purchase of the two residence lots owned by Mr. and Mrs. Joseph P. Cook and by Mr. and Mrs. Herman F. Cook, Jr., for the respective purchase prices of $18,000 and $20,000, without interest, less the deposit of $2,000 already paid, or not to do so; and, thereafter, if Seaton shall have elected to accept title to the said two lots, for the passage of a decree requiring the Cooks to convey unto Seaton the two lots upon receipt of the purchase prices, without interest, less the deposit, as above mentioned, and requiring the Cooks to convey to Westpark, Inc., the 5.2 acre tract, upon receipt of the purchase price of $50,000, without interest; or, if Seaton shall have elected not to take the two lots, or shall not have filed the election within the time limited, for the passage

of a decree dismissing Seaton's bill of complaint, requiring the Cooks to pay unto Seaton $2,000, with interest from October 28, 1958 at six per cent per annum until paid (in reimbursement for said deposit), and requiring the Cooks to convey to Westpark all three of said properties, upon receipt of the purchase price of $88,000, without interest.

In view of the role played in this case by Russell T. Baker and Company, through its agent, Larrick, and the fact that said company was the agent of the Cooks, the costs will be assessed against those parties. Maryland Rule 882 a.

> *Decree reversed and cause remanded for passage of an order and decree in conformity with this opinion; costs above and below to be paid one-half by Russell T. Baker and Company and one-half by Joseph P. Cook and Jane G. Cook, his wife, and Herman F. Cook, Jr., and Bernadine C. Cook, his wife.*