**Max GOCHMAN, Appellant,**

v.

**W. Guy DRAPER et al., Appellees.**

No. 11282.

Court of Civil Appeals of Texas.

Austin.

April 7, 1965.

Rehearing Denied April 28, 1965.

Maverick, Tynan & Gochman, San Antonio, Black & Stayton, Austin, for appellant.

Skelton, Bowmer, Courtney & Burleson, Temple, for appellees.

ARCHER, Chief Justice.

Appellant, Max Gochman, filed his suit to establish an equitable title to a leasehold estate as a tenant whose alleged right of first refusal to purchase the leasehold has been violated. Alternatively, appellant sought damages.

W. Guy Draper, W. Glenn Morgan and J. F. Clawson, appellees, defendants in the district court, answered with a plea of not guilty, various special exceptions, a general denial, various pleas of estoppel, recognition, waiver, laches, abandonment and ratification, and by a denial that appellant's right of first refusal was violated. Alternatively, appellees sought recovery for their expenditures in managing and maintaining the property. On July 16, 1964, judgment was entered that appellant take nothing by his suit and that appellees go hence with their costs.

At appellant's request findings of fact and conclusions of law were made, and on further request additional fact findings were made.

The appeal is founded on six points and are to the effect that the court erred in holding that appellant's rights were extinguished by failure to timely act, that appellant had actual knowledge of the date of foreclosure sale, and neglected and failed to purchase the property after December 6, 1960, and negotiated with appellees after such date for an allowance for repairs, and in basing its judgment upon pleas of estoppel, waiver or ratification because such defenses are not applicable and not supported by the evidence. The property in question is a leasehold estate originally owned by one Jack Baxter, covering 1.18 acres located at 4101 Interregional Highway in the City of Austin, Travis County, Texas. This leasehold estate will be referred to hereinafter as "the property."

The trial court made the following fact findings:

"FINDINGS OF FACT

"1. On June 20, 1959, JACK W. BAXTER, as Lessor, entered into a lease agreement with the Plaintiff, MAX GOCHMAN, as Lessee, covering 8835 square feet of 1.18 acres of

land involved in this case, being all of said 1.18 acres of land except the portion thereof leased by the said BAXTER to one CECIL C. GLASS. The lease between BAXTER and the Plaintiff contained the following clause:

" 'Lessor does hereby give and grant unto Lessee a first refusal to purchase the interest of the Lessor in and to the above described 1.18 acres of land or any part thereof in the event the Lessor during the initial term of this lease desires to sell or dispose of his interest in and to the same.'

"Said lease was recorded in Vol. 2138, Page 315, Deed Records, Travis County, Texas. The Plaintiff entered into possession of the leased premises shortly after the lease was executed and has remained in possession thereof up to and including the date of the trial and is in possession at the present time. He is not and has not been in possession of the portion of the 1.18 acres leased to CECIL C. GLASS.

"2. On November 5, 1959, the Lessor, JACK W. BAXTER, borrowed $15,000.00 from the FIRST NATIONAL BANK OF TEMPLE, signing a note therefor, and executed a written assignment of the rents from the Plaintiff's lease to secure the payment of such note. Said assignment was recorded in Vol. 2138, Page 305, on January 22, 1960 of the Deed Records of Travis County, Texas.

"On January 29, 1960, the Lessor, JACK W. BAXTER, borrowed the sum of $15,000.00 from the AUSTIN NATIONAL BANK at Austin, Texas, signing a note therefor, and at the same time executed and delivered a deed of trust on the 1.18 acres of land (including both the part leased to the Plaintiff as well as the part leased to CECIL C. GLASS). Such deed of trust contained a provision as follows:

" 'This conveyance is made subject to written subleases from grantor (BAXTER) to sublessees (GOCHMAN and GLASS) who are now in possession of the improvements located upon the real property above described and to that certain assignment of rents to First National Bank of Temple, Texas, dated November 9, 1959, recorded in Book 2138, Page 305 of the Deed Records of Travis County, Texas.'

"Said deed of trust was recorded in the Deed of Trust Records of Travis County, Texas on February 2, 1960 in Vol. 2150, page 403.

"3. The $15,000.00 note given by BAXTER to the AUSTIN NATIONAL BANK and the lien securing the same was sold and transferred by the AUSTIN NATIONAL BANK by written assignment to W. GLENN MORGAN, TRUSTEE on October 21, 1960, for the sum of $15,000.00. Such written transfer being filed of record on October 21, 1960 and recorded in Vol. 2242, Page 514 of Deed Records of Travis County, Texas. That W. GLENN MORGAN, in purchasing said note and lien, was acting as Trustee for himself and for W. GUY DRAPER and J. F. CLAWSON, all of whom are the Defendants in this case.

"4. The Plaintiff had actual knowledge of the existence of the note and deed of trust given by BAXTER to the AUSTIN NATIONAL BANK and that the said BAXTER had disappeared and his whereabouts were unknown.

"5. Because of the default in the payment of the note to the AUSTIN NATIONAL BANK, W. GLENN MORGAN, TRUSTEE, called upon WILLIAM R. COURTNEY, Substitute Trustee, in the deed of trust, to sell the property in accordance with the provisions of the deed of trust. Such Substitute Trustee duly posted notices

as required by the deed of trust and by the laws of Texas and on December 6, 1960, sold all of JACK W. BAXTER'S leasehold estate in and to said 1.18 acres of land involved in this lawsuit to Defendants, W. GUY DRAPER, W. GLENN MORGAN and J. F. CLAWSON, for the sum of $15,000.00 in cash and executed and delivered to such Defendants a substitute trustee's deed, which was filed in the Deed Records of Travis County, Texas, on December 6, 1960 and recorded in Vol. 2251, Page 324 thereof.

"6. Plaintiff received no actual notice of the foreclosure sale on or before December 6, 1960. He did not attend said sale and learned of it only after it had been held.

"7. At the time they acquired their interest in the property, and at the time of the foreclosure sale, the Defendants had both actual and constructive notice of the right of first refusal provided in the lease from Baxter to Plaintiff.

"8. At no time before, during or after the foreclosure sale on December 6, 1960 did the Defendants or any of them expressly offer to the Plaintiff an opportunity to buy the leasehold interest, or to match an amount bid at the foreclosure sale for the purchase of the interest subsequently conveyed by the trustee.

"9. That the Plaintiff had actual knowledge in December of 1960 that the Defendants had acquired the leasehold interest of JACK W. BAXTER in said 1.18 acres of land, which actual knowledge was received by the Plaintiff from the Defendant, CLAWSON, who told the Plaintiff of the foreclosure sale, and from the Witness, SASSER, an insurance agent, who told the Plaintiff of the new owners or landlords and who sent insurance policy endorsements to the Plaintiff showing the names of the Defendants as successors to BAXTER as owners of the property.

"10. That after December 6, 1960, the date of the foreclosure sale, the Plaintiff did more than pay rent to the Defendants. He settled the matter of repairs with them and received an allowance from them for such repairs of $723.12, representing repairs which the Plaintiff had made to the premises and for which he claimed reimbursement from his lessor. That he further bargained and negotiated with the Defendants to obtain the part of the BAXTER leasehold area leased to CECIL C. GLASS and which was not previously leased to the Plaintiff by BAXTER.

"11. That on February 15, 1961, Defendants purchased the $15,000.00 note that BAXTER had given to FIRST NATIONAL BANK OF TEMPLE and the assignment of rents securing the same for the sum of $9,673.83 all of which is shown by a written assignment from said Bank to the Defendants dated February 15, 1961.

"12. That on February 15, 1961, the Defendants borrowed $27,500.00 from FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF AUSTIN and gave a deed of trust on the leasehold estate on the 1.18 acres of land involved in this case to secure the payment of such note, which note was given for the purpose of refinancing the $15,000.00 the Defendants had paid to the AUSTIN NATIONAL BANK for the note above described and the $9,-673.83 they had paid to the FIRST NATIONAL BANK OF TEMPLE for the note described above and $1,-394.29 for City and School taxes, loan expenses, attorney fees, title policies and other expenses. That said deed of trust lien is presently outstanding against this property.

"13. That the Plaintiff for the first time on or about January 2, 1962, made

claim to the property involved in this case and gave notice to the Defendants that he wanted to exercise the right of refusal contained in the lease to purchase the property. This suit was filed on January 19, 1962 by the Plaintiff against the Defendants. The Plaintiff tendered $15,000.00 to the Defendants on May 11, 1962, and during the trial he tendered $15,000.00 and the costs of the sale. These offers were refused by the Defendants."

The following requested findings of fact were adopted by the district court insofar as they are consistent with findings previously made:

"1. On many occasions prior to December 6, 1960, defendant Clawson contacted the plaintiff and conferred with him about various problems concerning the property, and on all occasions advised plaintiff that he was a vice president of the First National Bank of Temple and that he was acting for the bank which had interest in the property under its assignment of rents from Baxter.

"2. In December of 1961, the plaintiff received from defendants a form approving his purchase of the Glass lease and this form was signed by defendants as owners of the property. Immediately after seeing this form the plaintiff began asserting his right of first refusal.

"3. In the summer of 1960 plaintiff offered to purchase Baxter's interest in the lease for $50,000.00.

"5. The plaintiff never stated to anyone at anytime that he was waiving his right of first refusal and would not exercise it in connection with the purchase of the property by defendants.

"6. Defendants never asked the plaintiff whether he was going to exercise his right of first refusal in connection with their purchase of the property.

"12. At the time plaintiff entered into the lease with Baxter he specifically demanded that the right of first refusal be included in the lease and this provision was a result of express bargaining and negotiation between plaintiff and Baxter."

There is some conflict in the testimony relating to the conversation at the December 10, 1960, meeting between appellant, appellee Clawson and witness Sterling Sasser, the latter being appellees' agent.

Appellees' counsel questioned appellant at length about the conversation at this time. Some of this testimony follows:

"Q. Well now, you remember on December 10, 1960, after the foreclosure, that Mr. Sasser and Mr. Clawson came to your place of business, do you not?

"A. Yes, sir.

"Q. And you remember that they told you that Mr. Clawson and his associates now own that property. Don't you remember that?

"A. No, sir; never said anything about owning the property. Said that they were charged, or he had the property, or something like that. They never used the word 'they bought' the property or they owned the property. That is why it never struck me that there was any sale.

"Q. Do you remember that Mr. Sasser told you that you now had a landlord here that you could deal with on settling all these bills?

"A. Well, they were not the landlord as far as I was concerned anyway, because my rent was assigned to them, so I just took it for granted that they were going on the same way, and maybe the man was going to come down and give me extra service.

\* \* \* \* \* \*

"Q. All right now, when Mr. Clawson and Mr. Sasser came to see you on December 10th, didn't Mr. Clawson agree to deduct those items from your rent?

"A. Well, I dealt mostly with Mr. Sasser, and if he agreed to it, it was all right with me, because I knew he was supposed to get the balance of the money after expenses were taken off, such as paying for the land lease, and so on, and taxes.

"Q. Didn't Mr. Clawson agree to those deductions on that occasion?

"A. Yes, he agreed to it.

"Q. And you did get the deductions from your rent?

"A. That is right.

"Q. And the amount was seven hundred and twenty-three dollars and twelve cents, was it not?

"A. I don't remember the exact amount.

"Q. Approximately, as best you remember?

"A. Approximately, yes.

"Q. And now, on that occasion I believe you said a moment ago they told you, they now had the property, is that right—or words to that effect?

"A. They said that he is now in charge, or something like that.

"Q. What?

"A. He is now in charge of the property, or something like that. In other words, whichever word he used—I cannot remember, but they didn't impress me as if he bought the property or owned the property.

"Q. Well, did you think he was talking for himself, or for the bank that he represented?

"A. For the bank.

"Q. And you thought the bank \* \* \*

"A. The only way I knew him was through the bank.

"Q. You thought from their conversation that the bank had acquired the property, is that what you thought?

"A. I thought that they were still in charge, the same as they had been, or being he was gone, they might have taken full charge to collect the rent. I didn't know what authority that Mr. Baxter gave it."

Appellant testified that the first time he knew that appellees were claiming title to the property by virtue of the foreclosure or otherwise was when, after negotiating a purchase of the Cecil Glass lease, he saw appellees' names on the form for landlord's approval.

Appellee Clawson was vice president of the First National Bank of Temple and when he first became interested in the property it was as a representative of that bank, which held an assignment of rents under the lease and a delinquent note from Baxter. Clawson and Gochman had "several" conversations about the property prior to December 10, 1960, and Clawson always "told him that you were interested in the property because of this delinquency the bank had" and "advised him that you were an officer and representative of the bank."

Clawson testified that on December 10, 1960, "Mr. Gochman inquired as to how we had acquired title to the property, and I advised him that we had bought the property in under a foreclosure of the Austin National Deed of Trust."

Witness Sasser accompanied Clawson to appellant's office at the time but "couldn't be specific" about whether Gochman was

advised of the foreclosure. Sasser confirmed that on many prior occasions Clawson had discussed the property with appellant and on all such occasions was openly representing the bank and protecting its interest in the assignment of rents. At one place in his testimony Sasser stated that on December 10, 1960, he told appellant, " 'Now we have got somebody who has control of the property' or something like that," but he later modified his testimony to a statement that he told appellant that "we now had a landlord and that Mr. Clawson represented the new landlord in this case."

Sasser also displayed a "general change endorsement" on certain insurance policies issued on the property, upon which the name of the owners of the property is changed to appellees. Sasser testified that he sent a copy of this form to appellant, but could not corroborate this with a cover letter. He had no memory "about sending the particular endorsement," and could not say whether he mailed or delivered it to appellant.

Appellant testified unequivocally that he did not receive the form and never saw appellees' names on any document showing ownership of the property until December 12, 1961.

In December of 1961, when appellant says he first learned of the foreclosure, he immediately took action, cancelled all negotiations with Glass and this suit was filed on January 19, 1962.

Appellees' attitude regarding the rights of appellant under the "first refusal" provision of his lease are stated by Mr. Clawson as follows:

"Q. Did Mr. Gochman ever tell you that he was not going to insist on his right of first refusal?

"A. He certainly has not.

"Q. Did the subject of that right ever come up between you all at any time?

"A. I don't think so, no, sir.

"Q. Until this dispute?

"A. No, I have always assumed he still had a right of first refusal. If we ever decided to dispose of it, I think we would have to offer it to Mr. Gochman."

The trial court made the following conclusions of law:

## "CONCLUSIONS OF LAW

"1. The provision in the lease from Baxter to Plaintiff quoted under the first finding of fact was valid and binding upon the parties to that lease and their successors; therefore, on December 6, 1960, Plaintiff was entitled to be given the opportunity to meet any price offered for the Baxter leasehold interest, and thereby to acquire said interest.

"2. At the time of the Substitute Trustee's sale, the Plaintiff was entitled to actual notice of the sale and the opportunity to be present in person or by an agent to meet any high bid.

"3. After the foreclosure and sale on December 6, 1960, the Plaintiff had an equitable right or interest whereby he could have paid to the Defendants the amount which they had bid and paid to the trustee, and thereby Plaintiff would have acquired the interest conveyed by said trustee.

"4. Plaintiff could not retain the aforesaid equitable right and interest indefinitely after receiving knowledge of the sale in December, 1960, inasmuch as he enjoyed nothing more than a right of refusal or to meet a certain price for the leasehold interest. He was required to assert this right and tender the purchase money within a reasonable time. However, he waited from December, 1960 until January, 1962, to declare his desire to purchase and he waited until May 11, 1962 to tender the purchase price. As a matter

of law and equity, Plaintiff's failure to act for such a long period of time amounted to a refusal on his part to buy the leasehold interest, extinguishing his equitable interest.

"5. The Plaintiff was guilty of laches in waiting so long to assert his right of first refusal and to make a tender of the purchase price.

"6. The Plaintiff recognized the title of the Defendants to the property, and recognized them to be his landlord by his course of conduct over the long period of time after he had actual knowledge of the foreclosure sale, and prior to any declaration of intent to purchase the leasehold interest.

"7. Defendants are entitled to judgment that Plaintiff take nothing by his suit, and that the cost be adjudged against the Plaintiff."

It is our opinion that appellant by virtue of the "first refusal" provision in his lease has a valuable, valid, enforceable contractual right which accrued when the foreclosure sale was made and which he has not lost by waiver, abandonment, estoppel or laches.

■ The phrase "first refusal" has acquired a well understood meaning in the business world which is that the owner of such right must be given the opportunity to buy the subject property on the terms offered by any bona fide purchaser. King v. Dalton Motors Inc., 260 Minn. 124, 109 N.W.2d 51, 1961; Barling v. Horn, 296 S.W.2d 94, S.Ct.Mo., 1956; Brenner v. Duncan, 318 Mich. 1, 27 N.W.2d 320, 1947; Jurgensen v. Morris, 194 App.Div. 92, 185 N.Y.S. 386; Tamura v. De Iuliis, 203 Or. 619, 281 P.2d 469, 1955; Nelson v. Reisner, 51 Cal.2d 161, 331 P.2d 17, 1958.

■ The fact that the sale of the property was through a foreclosure proceedings under a deed of trust executed by Baxter, the Lessor who made the sub-lease containing the "first refusal" provision, does not, in our opinion, adversely affect the interest conferred on appellant by such provision and does not prevent such sale from being a sale within the meaning of the words "desires to sell" as used in the "first refusal" provision of the sub-lease.

Baxter voluntarily executed the deed of trust on the leasehold which was foreclosed. He "desired" to do this, or he would not have done so. He also "desired" that it include the right to sell on his default. It would be inconceivable to hold that Baxter could extinguish the valuable right of "first refusal" conveyed by him to appellant by the simple device of borrowing money on the property and permitting it to be sold on his default.

In Price v. Town of Ruston, 171 La. 985, 132 So. 653, 1931, a similar situation was presented. In that case the owner of property contracted with an Elks Lodge for the Lodge to build a third story on a building located on the owner's property. The contract stated that in the event the Elks should desire to sell the owner would be given the option and preference of purchasing at the price of the sale. After executing the contract, the Elks borrowed money securing a loan with a mortgage on the property. They failed to meet payment on the mortgage and the property was foreclosed and sold at a sheriff's sale for $3100.00 to the Town of Ruston. The heirs of the original owner then offered the $3100.00, which was refused. The court held that the heirs of the owner were entitled to the property upon payment of the $3100.00 because the situation was exactly the same as though the sale was voluntary. The court in that case construed the expression "in the event the party of the second part desires to sell" as contemplating any sale, "whether willingly or because of financial inability to hold the property."

There is no problem of notice here. The sub-lease to appellant was of record. Appellant was in possession of the property. The deed of trust under which the sale to

appellees was made was expressly subject to appellant's lease.

■ It is indisputable that a purchaser from a lessor who has given lessee a right of first refusal to buy takes the property subject to that right and lessee must be granted the opportunity to purchase at the price transferred. Moreno v. Blinn, 81 Cal. App.2d 852, 185 P.2d 332, 1947; Denco, Inc. v. Belk, 109 So.2d 201, Ct.App.Fla., 1959; Tinkler v. Devine, 159 Kan. 308, 154 P.2d 119, 1944; Driebe v. Ft. Penn Realty Co., 331 Pa. 314, 200 A. 62, 117 A. L.R. 1091, 1944; Casto v. Cook, 91 W.Va. 209, 112 S.E. 502, 1922.

There remains to be considered only the question of laches, waiver, estoppel or abandonment by appellant. It is our opinion that none of these defenses to appellant's right to a "first refusal" exists.

In the first place, appellant has never been offered the right of a "first refusal."

He has never been told by appellees that they would convey him the property upon the payment of its cost to them. Just as importantly, appellant has never been told by appellees what the cost to them was and he does not now know, accurately, what the cost of such property was.

■ The burden was on appellees to offer appellant a "first refusal," and, of course, to disclose the amount required for him to be substituted as the purchaser. Until appellant was apprised of these matters, he was under no duty to act. Cortese v. Connors, 1 N.Y.2d 265, 152 N.Y.S.2d 265, 135 N.E.2d 28, 1956; Westpark, Inc. v. Seaton Land Co., 225 Md. 433, 171 A.2d 736, 1961; Brenner v. Duncan, 318 Mich. 1, 27 N.W.2d 320, 1947; Gutch v. Meccia, 142 N.J.Eq. 430, 60 A.2d 649, 1948; Thompson on Real Property, 1959 Replacement, Vol. 3, Sec. 1151, p. 374.

In Westpark, Inc. v. Seaton Land Co., supra, the Court stated: "From the nature of the right of refusal in this case, Westpark was under no obligation to make an offer to the Cooks, but was entitled to rely upon the Cooks' contractual obligation to afford it an opportunity to meet any acceptable offer made by another." 171 A.2d at 744.

■ No opportunity of this character has been afforded appellant and it is our opinion that until such opportunity is afforded him that he was under no duty to act in reference thereto. He was, of course, obligated not to so conduct himself as to mislead appellees to their injury.

It is undisputed that appellees were not misled by anything that appellant said or did for the reason that they relied exclusively on their conviction that appellant had no right of refusal under the circumstances.

The injury which appellees claimed to have sustained are these:

"* * * making valuable improvements to the property, paying all expenses in connection with this operation, keeping the property up, executing lease agreements with other people, paying delinquent City, State and School taxes, paying claims of third parties for improvements to the property, making many trips to Austin to look after the premises, managing the property, collecting rents and paying obligations due on the property. They bought the note of FIRST NATIONAL BANK OF TEMPLE and paid cash for it. They negotiated and arranged the FIRST FEDERAL loan in Austin, paying out expenses of a title policy, attorney fees, closing costs and other items. (Brief of appellees, pp. 35-36)"

The loan from First Federal of Austin was, according to the undisputed finding of the District Court, simply a "refinancing of the $15,000.00 the Defendants had paid to the AUSTIN NATIONAL BANK for the note above described and the $9,673.83 they had paid to the FIRST NATIONAL BANK OF TEMPLE for the note described above and $1,394.29 for City and

School taxes, loan expenses, attorney fees, title policies and other expenses."

■ Appellees have become personally liable on the First Federal loan and this is a contingent detriment. This, however, as well as the other expenditures made by appellees does not evidence such a detrimental change of position as to bar appellant from relief for the reason that their personal liability and expenditures made by them will be discharged and reimbursed by compliance with the judgment to be rendered herein. The rule which we apply is stated in Culver v. Pickens, 142 Tex. 87, 176 S.W. 2d 167, as follows:

"In Ross' Estate v. Abrams, Tex.Civ. App., 239 S.W. 705, 709, Chief Justice Fly quoted with approval from Pomeroy on Equity, Vol. 5, Sec. 1442, as follows:

" ' "Laches, in legal significance, is not mere delay but delay that works a disadvantage to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within the limits allowed by law; but when knowing his rights, he takes no steps to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right." '

"The petition before us does not reveal any change of conditions or circumstances which would render it inequitable, as a matter of law, to permit petitioners to assert their cause of action. It is alleged that respondents paid for the properties upon which it is sought to establish a constructive trust, not with their own money, but with money belonging to the estate of the deceased, and there is no allegation that they have ever spent any of their own money in operating these properties other than that produced by the properties themselves. There is no allegation that rights of third parties have intervened. In short, we can perceive no equitable reason for denying petitioners the right to prosecute their suit. The elements of estoppel do not appear."

The condition of our judgment will be that appellees be restored to their former state.

We reverse and remand this cause with the following instructions:

Grant appellant relief in the nature of specific performance, bearing in mind appellant's offer to do equity by making appellees whole in all respects. When this is accomplished, a conveyance from appellees to appellant conveying to appellant all of appellees' right, title and interest in the property should be directed and accomplished in the judgment.

■ In adjusting equities between the parties, appellees should be charged with the rents received from the time of the trustee's sale and appellant should be charged interest at the rate of 6% per annum on the purchase price from such date, also appellant should be similarly charged on all other sums expended by appellees on the property from the date of such expenditures.

Appellant must discharge or satisfactorily protect appellees from any personal liability which they may be under in respect to this property.

The judgment of the trial court is reversed and this cause is remanded for further proceedings in accordance with this opinion.

Reversed and remanded with instructions.