620 A.2d 1372

**Harry M. LEET et alia**

**v.**

**Sami TOTAH, Trustee.**

**No. 62, Sept. Term, 1992.**

Court of Appeals of Maryland.

Feb. 9, 1993.

On Motion for Reconsideration
April 5, 1993.

646

Patrick C. McKeever, argued and briefed (Miles & Stockbridge, on brief), Rockville, for appellant.

Roger W. Titus, argued and briefed (Venable, Baetjer and Howard, and Gregory L. Laubach, on brief), Rockville, for appellee.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (Retired, Specially Assigned).

RODOWSKY, Judge.

In this action alleging breach of a contract to sell land by the vendors' refusal to convey, the purchaser obtained judgment for $15 million in expectation interest damages. A contract provision limited the purchaser's remedies for the vendors' default, "including failure to make full settlement," either to specific performance or to rescission and return of the purchaser's deposit. The circuit court ruled as a matter of law that the provision limiting remedies was void, as contrary to public policy, or, if not per se void, that the provision was inapplicable under the facts of the instant action. Following the vendors' appeal, this Court granted certiorari on its own motion to review that legal ruling.

The property involved is approximately 417 acres of farm land (the Property) in the Germantown area of Montgomery County. The vendors and appellants are Harry M. Leet (Leet) and Helen A. Leet, husband and wife (the Leets). Leet, a member of the New York and Ohio bars, moved to Montgomery County in 1949, where he has become a real estate investor. Leet acquired the Property by two conveyances, one a deed to Leet of November 12, 1958, and the second a deed to Leet, as Trustee, of February 5, 1973. The total, original investment was approximately $430,000. By deed dated June 22, 1982, Leet had conveyed a portion of, or interest in, the Property to Helen A. Leet.

The appellee, Sami E. Totah (Totah), is a real estate developer who has conducted that business in Montgomery County and in other jurisdictions.[1] Totah, as purchaser, and the Leets, as vendors, executed the original contract for

---

1. Totah sues "in his capacity as trustee for, and for the benefit of, Arcola Investment Associates, a Virginia general partnership." Consolidated Amended Complaint at ¶ 1.

the purchase and sale of the Property on December 28, 1984, at which time Totah paid a $100,000 deposit.[2] The original contract was modified by a number of written addenda. Insofar as appears from the record, the parties negotiated, drafted and executed the original contract and the addenda without the counsel of any member of the Maryland bar.

Under the contract the Property was not to be conveyed as an entire tract. In their contract the parties contemplated that Totah would formulate a plan of development for the Property that would be approved by public authority. The total purchase price was based upon the number of dwelling lots or units actually approved, and Totah was to settle incrementally, by groupings of approved lots, over a period of up to nine years after settlement on the first lots that he acquired. The date of the first settlement depended on approval by appropriate public authorities of rezoning, of the preliminary plan of subdivision, and of final engineering for the first grouping of lots, and on notice to proceed under a public contract for water and sewer service. A preliminary plan was to be submitted within 180 days from December 28, 1984. The outside date for obtaining all of the approvals, absent extension at the vendors' option, was December 31, 1988, four years from when the contract was signed. Absent the required approvals at that time, either party had the option to declare the contract void, in which event the deposit would be refunded to Totah.

The contract set the price to the Leets of a single family lot at $11,500, of a townhouse lot at $9,000, and of a MPDU (Moderately Priced Dwelling Unit) at $100. These prices were subject to adjustment for inflation measured by the United States Bureau of Labor Statistics National Consumer Price Index. Under the then extant 1974 master plan for

---

2. Leet contracted "individually and as trustee for his children." Any trust for the Leets' children, to which that designation of capacity referred, is immaterial to the issues on this appeal. Consequently, we shall refer only to the Leets as vendors.

Germantown, and under the then applicable R–200 zoning of the Property, the parties contemplated that the Property would produce approximately 1,500 lots. The contract set $14 million as the minimum total purchase price of all of the approved lots.

Because Leet did not want to wait until the first of the contemplated series of settlements to find out whether Totah had any objections to the title, the contract required title examination to be completed within 120 days following execution of the contract. The contract then provided:

"[T]itle at that time is to be good of record and in fact, marketable and fully insurable by a title company at regular rates, without exception, or the sale is to be declared off at the option of Purchaser and deposit returned, unless the defects are of such character that they may be remedied by legal action within a reasonable time, but the Seller and Agent are hereby expressly released from all liability for damages by reason of any defect in the title, except due to act or omission of Seller subsequent to date of this Contract. From the date of acceptance of the conditions of the contract by Purchaser, Seller shall take no action ... which will result in any additional change to the Title or any additional encumbrance, easement, restriction, covenant, or condition on the property without the prior written consent of Purchaser."

We shall hereinafter refer to the above-quoted provision as the "Title Warranty Clause."

With respect to possible defaults, the contract contained the following provisions:

"If Purchaser shall default under this Contract of Sale, the balance of the Good Faith Deposit and accrued interest thereon, shall be paid to Seller, ... this Contract of Sale shall terminate and the parties hereto shall be released from further liability or obligation to the other.

"If Seller shall default under this Contract of Sale, including failure to make full settlement pursuant to the terms hereof, Purchaser, at its option, may (i) direct that

the balance of the deposit with interest thereon be paid to Purchaser, the Contract terminated and each party relieved of further liability or obligation to the other, or (ii) seek relief in the courts to require specific performance. Seller shall not be liable for money damages for any default hereunder.

"In the event of default under this Contract of Sale, the non defaulting party agrees to provide at least thirty (30) days' written notice from date of notice of default for the defaulting party to cure the default."

We shall hereinafter refer to the second of the three above-quoted paragraphs as the "Remedies Limitation Clause." It is the clause on which the Leets exclusively rely in seeking a reversal of the money judgment entered against them.

Totah assembled land planners, engineers, and legal counsel to address preparation of a plan of development for the Property. By April 17, 1985, it had become evident to both parties that the maximum lot yield from the Property would be less than initially contemplated. On that date the parties reduced their projection of the number of lots that the Property would yield to 1,024. The minimum total purchase price was reduced accordingly to $10 million. The "outside date for obtaining all the approvals" was extended to December 31, 1989, and Totah obtained an option further to extend that date to December 31, 1990, by paying an additional deposit of $50,000 in cash. The parties further agreed that Totah's "obligation to submit a preliminary plan ... is hereby delayed to December 31, 1987." That deadline could be further extended by agreement of "legal counsel for both parties ... that it would be detrimental to the property to submit such preliminary plan by December 31, 1987."

During this period the staff of the Maryland–National Capital Park and Planning Commission was developing its recommendations for a new master plan for the Germantown area, and the staff was giving serious consideration to recommending rezoning the Property to require a minimum

lot size of two acres per dwelling unit. By their fourth addendum, dated March 31, 1986, the parties agreed that if the new master plan showed a minimum yield of 1,000 residential units for the Property, Totah would perform a boundary and topographical survey of the Property within nine months of that plan's adoption. If the yield on the new master plan were less than 1,000 units, Totah would have the option to void the contract and to obtain return of the deposit.

In August 1987, the Staff Draft of the Comprehensive Amendment to the Germantown Master Plan was published. The draft recommended a minimum lot size of two acres per dwelling unit for the Property. Totah nevertheless continued to urge to the planning staff that the Property was appropriate for planned development, a species of floating zone. Totah also continued pursuing his efforts to convince community organizations that his concepts for development of the Property were appropriate.

By mid-December 1987, as the contractual deadline for submitting a preliminary plan was rapidly approaching, Totah's zoning counsel wrote to Leet, explaining why counsel believed submission of a preliminary plan at that time would not be advisable, and requesting an extension. Leet replied that he would extend the time only if certain changes were made in the contract, including an increase in the minimum price to $16 million. Totah thereupon caused a preliminary plan to be prepared on a highly expedited basis and had it filed on December 29, 1987. Totah's letter of December 31, advising Leet of that filing, crossed in the mail with Leet's letter of January 2, 1988, warning Totah that he was in default if the preliminary plan had not been filed timely.

The Planning Commission, in September 1988, issued its final draft of the new master plan. The Commission proposed continuation of the R–200 zoning on the Property, but in addition recommended that it be developed as PD–2, a planned development floating zone. The Montgomery

County Council, sitting as the District Council, essentially approved the new master plan in June 1989.

Totah, in August 1989, applied for a zoning reclassification to PD–2 for the Property. The accompanying development plan proposed a mix of single family detached homes and garden apartment units. While the application for zoning reclassification was pending, Totah, on December 8, 1989, paid the Leets $50,000 to extend the deadline for all contractually required approvals to December 31, 1990.

Then, by letter to the Leets of December 19, 1989, Totah called for settlement on the entire Property to be held on December 27, 1989, at which time Totah would pay the minimum total purchase price of $10 million. Calculations enclosed with the letter undertook to demonstrate that the maximum number of single family dwelling units and of MPDUs, either under the then existing R–200 zoning or under the proposed PD–2 zoning, would produce, at the stipulated prices, after cost of living adjustments, a total purchase price less than the minimum $10 million. Totah took the position that all unfulfilled conditions of the contract were for his benefit, and that he waived those benefits.

The Leets replied through counsel, who became trial counsel in this action.[3] Their reply referred to Totah's purported breaches and to failures to satisfy conditions. The Leets spoke of the dramatic appreciation of the Property during the period it had been under contract.[4] The letter concluded: "Mr. and Mrs. Leet hereby cancel the contract unless you notify us forthwith that you will agree to adjust the price equitably."

---

**3.** The attorneys representing the Leets on this appeal were not trial counsel.

**4.** The reply letter parenthetically estimated the Property then to have a value of $65 million. At trial it was conceded that the estimate was puffing. Leet, however, acknowledged on deposition and at trial that the Property was worth $25 million in December 1989.

Totah filed this action on December 28, 1989, one day after the date he had specified for settlement.[5] In addition to suing the Leets, Totah's complaint also joined the Leets' three adult children as defendants. This was because the Leets had conveyed undivided interests in the Property to their children after Totah had completed the title examination made within 120 days following the signing of the contract. One deed is dated December 31, 1986, and a second is dated January 14, 1987. Each deed is from Leet, "Donor," to his three children, "Donees." Each deed reads in relevant part:

"WITNESSETH, that in consideration of the love and affection Donor has for Donees, Donor does hereby give, grant and convey to Donees in equal shares an undivided twelve (12) acres of Donor's portion of [the Property], being part of the same land which was conveyed to Harry M. Leet by deed dated November 12, 1958. . . .

"Helen A. Leet, wife of Donor, consents to and joins in this deed, for the purpose of releasing her marital estate in the property conveyed, and otherwise as may be pertinent."

Leet testified that the interests conveyed were gifts to his children and were intended to take advantage of the maximum annual gift tax exclusion. He testified that, in concentrating on estate planning, he simply forgot that the contract with Totah provided that "Seller shall take no action . . . which will result in any additional change to the Title."

After a battle of motions, the recounting of which would be both unnecessary and painful, the case was at issue on Totah's consolidated amended complaint and the defendants' answer and request for jury trial. Count I of the complaint, with which we are principally concerned here,

---

5. After filing this suit, Totah continued working toward a rezoning of the Property. On September 25, 1990, the County Council for Montgomery County, sitting as a District Council for the Maryland–Washington Regional District, approved Totah's August 1989 application requesting that the Property be rezoned.

alleged breach of contract by the Leets in failing to convey after settlement had been called for by Totah. Under Count I Totah's requests for relief claimed (1) $100 million in damages from the Leets and (2) specific performance by the Leets and by their children. Count II of the complaint alleged breach of the Title Warranty Clause by the gifts to the children. The Count II requests for relief claimed (1) damages from the Leets and (2) specific performance by the Leets, but not by their children.[6]

While the action was awaiting trial, Totah's counsel, by letter of November 29, 1990, informed the Leets' counsel that the financing commitment secured by Totah to purchase the Property was to expire on January 31, 1991. Totah had paid his bank $15,000 to extend to the 1991 date the financing commitment under which funding for the December 27, 1989, closing was to have been obtained.

As the trial date in this action approached, more motions were filed. Two days before trial the circuit court held a hearing on all pending motions. At that time counsel for Totah directly addressed the Remedies Limitation Clause by making, as described in the docket entry, "plaintiff's oral motion in limine as to damage clause." Counsel submitted that it was "essential" that the court rule on the Remedies Limitation Clause before the trial began saying: "[I]f I know that I am faced with a contract that gives me no damages whatsoever under the circumstances of this case, I ought to know that at the beginning of trial, not the end." After extended argument, the court ruled that "the damage

---

6. The complaint contained seven counts. Count III, alleging intentional interference with contractual relations against the Leets and their children, was determined on motion for judgment in favor of the defendants at the close of the case. Similarly disposed of on motion for judgment was Count IV, alleging fraudulent misrepresentation by the Leets. Totah does not cross appeal those judgments. Counts V and VI, predicated on theories of *quantum meruit* and unjust enrichment, claimed only against the Leets. Count VII, predicated on promissory estoppel, claimed damages against the Leets and specific performance against all the defendants. Under the circuit court's instructions, the jury, after reaching its verdict on Count I, did not consider other submitted counts.

waiver does not apply ... [t]o any count." The docket entry records that the oral motion in limine was granted.

Prior to proceedings before the jury on the first day of trial, counsel and the court returned to the subject of the Remedies Limitation Clause. Totah's counsel requested the following:

"Your Honor, I would like to ask in light of the Court's ruling that you made that damages can be claimed under all counts, that [defense counsel] be precluded during the opening argument to the jury from describing this 'you can't get any damages' clause and starting to get the jury confused about something that you have already ruled on."

Defense counsel argued that the proper time for instructions was after the close of the evidence. The court ruled: "I am going to instruct them [(the jurors)] as to that [(invalidity or inapplicability of the Remedies Limitation Clause)], but I am going to let him [(defense counsel)] argue it [(the Remedies Limitation Clause)]."

In that same colloquy Totah's counsel advised the court that the claims for relief by way of specific performance were being withdrawn "in light of the ruling" that the court had made two days earlier.[7]

In the course of his opening statement, defense counsel referred to a power of attorney to Leet from the children-

---

7. The transcript reads:

"[PLAINTIFF'S COUNSEL]: Now, judge, in light of the ruling that you made on Monday concerning our entitlement to pursue damages under all counts of the amended complaint, I wanted to advise you that we are hereby withdrawing the second prayer for relief in both counts one and count two.

"That is the prayer in each of those counts—the first one being breach of contract, the second one being breach of warranty of title in which specific performance is requested. We are going to be proceeding on the basis of benefit of the bargain damages.

"THE COURT: All right. Specific performance will be withdrawn."

A docket entry of June 12 reads: "Hearing on plaintiff's oral motion to remove count #2 (specific performance) ... granted."

grantees.[8] Totah objected, contending that the circuit court had ruled, pre-trial, that the power of attorney was irrelevant. During the ensuing bench conference, Totah's counsel further urged the court then and there to advise the jury of the court's ruling on the Remedies Limitation Clause, but the court adhered to its decision to instruct at the end of the case.

Defense counsel concluded his opening statement by telling the jury that "the key to getting the right answer in this case [is to] find it in the contract." Again Totah's counsel objected and, at the bench, requested an immediate instruction that the Remedies Limitation Clause had been ruled out of the case. The court deferred until after the luncheon recess.

After reconvening, but out of the presence of the jury, the parties again presented their arguments pro and con. When the jurors reentered the courtroom the court advised them that it had "ruled as a matter of law that the provision ... stating that the seller shall not be liable for money damages for any default hereunder was void as a matter of law. You will not consider that as a part of the contract."

Substantially the same instruction was included in the court's charge to the jury at the conclusion of all of the evidence.

The jury returned a verdict in favor of Totah for $15 million, representing the market value of the Property at the time of settlement, less the contract price. That verdict was on Count I. Under the court's instructions, and because the jury found that the damages awarded under Count I fully compensated the plaintiff, no verdict was rendered on Count II, alleging breach of the Title Warranty Clause, or on any other count submitted to the jury.

---

**8.** By a special power of attorney executed by each of the three adult children in January 1991, Leet was authorized to convey "pursuant to any final order of Court" in the instant action, the interests conveyed to the adult children by the two deeds of gift. The power of attorney was produced in discovery, but it was not an exhibit at trial.

This appeal followed. The Leets argue but one point, namely, that the circuit court erred in ruling the Remedies Limitation Clause out of the case as a matter of law. In support of the ruling Totah's arguments may be condensed into three substantive points: (A) The more general Remedies Limitation Clause does not apply to the breach of the more particular Title Warranty Clause; (B) Limitation of damages for this intentional breach of contract is unconscionable and contrary to public policy; and (C) The remedy may not be limited to specific performance where the seller has thwarted that contract remedy by deliberately clouding the seller's own title. Procedurally, Totah argues that the Leets failed to preserve the claimed error for appellate review because no exceptions were taken following the court's instructions to the jury concerning the Remedies Limitation Clause.

## I

The Remedies Limitation Clause could not be more plain. The judgment for $15 million representing the loss of the benefit of the bargain directly conflicts with the provision that the "[s]eller shall not be liable for money damages for any default hereunder." If the quoted provision operates, the judgment must be reversed. We turn then to Totah's reasons why the clause does not operate.

## A

Totah's first argument is based on a construction of the contract. The contract contains two provisions limiting damages, one in the Remedies Limitation Clause and the other in the Title Warranty Clause ("Seller and Agent are hereby expressly released from all liability for damages by reason of any defect in the title, except due to act or omission of Seller subsequent to date of this Contract."). The Leets also agreed to "take no action ... which will result in any additional change to the Title." This covenant was breached, Totah submits, by the conveyance to the Leets' children. Totah further submits that, because the

Title Warranty Clause is the more particular of the two clauses dealing with limitations of damages, breaches of the covenants relating to title are not governed by the more general Remedies Limitation Clause. Within the Title Warranty Clause, a post contract, unauthorized "change to the Title" is not protected by any limitation of damages. Accordingly, Totah concludes, the breach that changed the title is fully compensable, unlimited by either clause.

The argument is irrelevant to the case presented on this appeal. The judgment appealed from was rendered on Count I, alleging a total breach by the Leets through their failure to settle. The Leets unsuccessfully defended against that claim, within the strictures of the circuit court's ruling on the Remedies Limitation Clause, by contending that conditions precedent to the vendors' obligation to convey had not been satisfied, and by contending that one or more breaches by Totah excused the vendors' duty to perform. But the jury returned no verdict on Count II of the complaint, so that there is no fact-finding whether the Leets substantially breached the Title Warranty Clause. There was never any determination whether, had the Leets gone to closing, they could have produced good title, through the cooperation of their children, as they contended they could. Although the evidence is undisputed that the conveyances to the children were made, that breach would be merely incidental if it were cured by the time of closing.

Thus, it is presently immaterial whether the Title Warranty Clause applies to the breach alleged in Count II, to the exclusion of the Remedies Limitation Clause. The conclusion, either way, on that issue does not prevent the plain words of the Remedies Limitation Clause from applying to the claim asserted in Count I on which judgment was rendered.

## B

■ Totah's public policy argument characterizes Leet's conduct as unconscionable and in bad faith. Totah emphasizes these factors:

"(1) attempting to extract from Totah sums vastly in excess of the contract price, (2) deliberately disabling himself from conveying the Property by unauthorized conveyances to his children, and (3) persisting in his default for such a protracted period of time that Totah's ability to perform expired together with a loan commitment that simply could not be renewed."

Brief and Appendix of Appellee at 21.[9]

Totah places principal reliance on the language, emphasized below, from the opinion by Judge Levine for this Court in *Maryland–Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 386 A.2d 1216 (1978).

"[U]nless clearly prohibited by statute, contractual limitations on judicial remedies will be enforced, absent a positive showing of fraud, misrepresentation, *overreaching, or other unconscionable conduct on the part of the party seeking enforcement.*"

*Id.* at 611, 386 A.2d at 1231 (emphasis added).

The Remedies Limitation Clause is the product of arms length bargaining between two sophisticated businessmen, Totah and Leet. The evidence shows that the writing was typed in Totah's office. The provision could not have come as a surprise to Totah. Further, there is mutuality between the Remedies Limitation Clause, dealing with a default by the vendors, and the clause which deals with a default by the purchaser. In the latter event, even if the Property had declined in value below a determinable total purchase price, or below the minimum purchase price, the purchaser would have lost only his deposit, but he would have been "released from further liability or obligation to the" vendors. In that latter event, the vendors could not have obtained that sum of money from Totah that would have put them in as good a position as if the contract had been performed.

---

**9.** The legal conclusion embodied in factor (2) will be analyzed in Part I.C, *infra.*

Further, the combination of the purchaser's and the vendors' default clauses support an inference of a permissible business purpose.[10]  At contract formation the parties contemplated a period of performance that could extend up to thirteen years.  Default by either party could occur at any point along that time line.  Because a factor in the selling price, namely, the inventory of possible or actual lots from time to time, was subject to so many variables, computation of gain or loss would be difficult both to prove and to defend against.  Were the vendors accused of a substantial breach, and were the purchaser also to seek damages based on the loss of profit on resale of the lots, the damage claim and defense against it would become even more complicated.  The Remedies Limitation Clause eliminates the complexities.  If the purchaser concludes that the vendors are in default, the purchaser may affirm the contract and seek specific performance or rescind the contract and obtain a return of the deposit.

Assuming, *arguendo*, that the doctrine of unconscionability may even be applied to a damage limitation clause in a contract between an investor and a developer for the sale of unimproved land, the subject contract is not unconscionable.  Guidance as to Maryland public policy relating to unconscionable contracts, or clauses in contracts, can be found in § 2–302(1) of the Uniform Commercial Code, relating to the sale of goods.  Md.Code (1975, 1992 Repl.Vol.), § 2–302(1) of the Commercial Law Article (CL).  The official comment to that section points out that "[t]he principle [of unconscionability] is one of the prevention of oppression and unfair surprise (Cf. *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir.1948) and not of disturbance of allocation of risks because of superior bargaining power."  Against the background of this transaction, the Remedies Limitation Clause reflects neither oppression nor surprise.  *Cf.* CL § 2–302(2).

---

**10.**  There was no finding by the court, preliminary to its legal ruling, concerning the purpose of the Remedies Limitation Clause, and its related provisions.  There was no direct evidence on the subject.  A proffer by defense counsel as to the origin of the clause is unclear.

The public policy that is applicable to the instant matter was stated in *Washington Nat'l Arena* in the passage quoted below:

"Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would ... pronounce it' invalid. This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle."

282 Md. at 606, 386 A.2d at 1228–29 (citations omitted).

### C

█ Deserving special attention is the treatment in Totah's argument of the effect on the Remedies Limitation Clause of the conveyance to the Leets' children. Totah describes Leet as "a vendor who both disables himself from conveying and refuses to come to settlement." Brief and Appendix of Appellee at 20. Totah says that Leet "deliberately clouded his own title, thus thwarting the contract remedy of specific performance, and [he] later refused to go to settlement...." *Id.* at 26. The argument is that the Remedies Limitation Clause cannot be applied to limit Totah to a remedy which Leet, by his conduct, has made unavailable.[11]

---

**11.** There are a number of legal theories that might be applied to the argument in addition to Totah's public policy and unconscionability labels. For example, if Leet had destroyed the specific performance remedy, one could argue that he should be estopped to rely on the Remedies Limitation Clause. Alternatively, one could argue that the Remedies Limitation Clause contains an implied covenant of good

The Leets, however, present a short, and correct, answer to these arguments. Specific performance is available on the facts of this case because the children are not bona fide purchasers for value. This answer flows from the uncontradicted facts that the contract with Totah preceded the deeds to the children and that the deeds were gifts. The answer is not dependent on a fact-finding that the children would cooperate and voluntarily reconvey their interests in the Property to their parents, or convey their interests to Totah. The answer is not dependent on the power of attorney given by the children to Leet.

The principle is stated in Pomeroy, *Specific Performance of Contracts* § 465.1, at 946–47 (1926) (footnotes omitted), as follows:

"The doctrine is well settled that when the vendor, after entering into a contract of sale, conveys the land to a third person who has knowledge or notice of the prior agreement, or who does not part with a pecuniary consideration, or who for any other [reason] is not a *bona fide* purchaser for value, such grantee takes the land impressed with the trust in favor of the original vendee, and holds it as trustee for such vendee, and can be compelled at the suit of the vendee to specifically perform the agreement by conveying the land in the same manner, and to the same extent, as the vendor would have been liable to do, had he not transferred the legal title; and such grantee is the proper defendant in the suit against whom to demand the remedy of a conveyance."

*See also id.* § 294 n. 1, at 664.

Maryland cases have applied this doctrine. "The general rule is that a purchaser of real estate takes subject to outstanding equitable interests in the property, which are enforceable against him to the same extent they are enforceable against the vendor, where the purchaser is not entitled to protection as a bona fide purchaser." *Westpark,*

---

faith under which neither party would extinguish the limited remedy of the other party.

*Inc. v. Seaton Land Co.,* 225 Md. 433, 450, 171 A.2d 736, 743 (1961). *Westpark* dealt with competing equitable interests, the earlier of which had been created by a right of first refusal, while the later was created under a standard executory contract of sale for the same land. We held that, because the owner of the later interest received notice of the earlier equity "before paying any except a small portion of the purchase money and before acquiring legal title," the later equity was bound by the outstanding earlier right of first refusal. *Id.* at 451, 171 A.2d at 743. Other Maryland cases illustrate notice destroying bona fide purchaser for value status. *See Lewis v. Rippons,* 282 Md. 155, 161–62, 383 A.2d 676, 680 (1978); *Grayson v. Buffington,* 233 Md. 340, 343, 196 A.2d 893, 895–96 (1964); *Blondell v. Turover,* 195 Md. 251, 257, 72 A.2d 697, 699 (1950); *Engler v. Garrett,* 100 Md. 387, 398, 59 A. 648, 650 (1905); *Gore v. Condon,* 82 Md. 649, 33 A. 261, 262 (1895); *Cole v. Cole,* 41 Md. 301, 304 (1875); *Smoot v. Rea,* 19 Md. 398, 410–12 (1863).

In *Pearson v. Courson,* 129 Ga. 656, 59 S.E. 907 (1907), specific performance was available to the purchaser of land under a contract against a subsequent grantee who had not paid any consideration. The same result has been reached where the contract was one to make a will in exchange for services that had been fully performed. *See Young v. Young,* 45 N.J.Eq. 27, 16 A. 921, 928 (1889).

The commentators agree. *See* IV *American Law of Property* § 17.10, at 562–63 (1952) ("The term ['purchaser'] does not include ... donees"); 1 M. Friedman, *Contracts and Conveyances of Real Property* § 4.8(g), at 419 n. 7 (1991) ("One is not a bona fide purchaser for value until he acquires legal title and pays the full purchase price."); E. Fry, *Treatise on the Specific Performance of Contracts* § 241 (1911) (Where realty is subject to contract to sell, and realty is subsequently transferred to third party, third party may be ordered specifically to perform "[w]hen the transferee takes as a volunteer."); 5 H. Tiffany, *The Law of Real Property* § 1258, at 5 (1939) ("[E]quity regards as

unconscientious the retention of the right of property, as against a prior equity, by one who acquired it ... without paying value, and will give relief against him accordingly." (footnote omitted)); *id.* §§ 1300–1301; *see also* Md.Code (1974, 1988 Repl.Vol.), § 1–101(a) and (*l*) of the Real Property Article ("[U]nless otherwise apparent from context," the word " 'Purchaser' has the same meaning as buyer or vendee.").

■ Nor does the fact that Totah's loan commitment expired during the pendency of this action prevent a court from awarding specific performance. In fashioning a decree of specific performance in favor of a purchaser who was ready, willing, and able to settle at the time of settlement, a court, while encouraging the arrangement of prompt financing, may provide a reasonable time for the purchaser to satisfy the conditions of existing financing commitments, as they may have been affected by the litigation, or to arrange substitute financing. *See Castle v. Cohen,* 840 F.2d 173, 178–79 (3d Cir.1988); *see also Commercial & Indus. Properties, Inc. v. Anello,* 36 Md.App. 191, 194–95, 373 A.2d 82, 84–85 (1977) (purchaser need not preliminarily prove ability to pay purchase price in order to have court of equity entertain purchaser's suit for specific performance).

Following the entry of the judgment in the instant action, the Property, including the interest of the Leets' children, has served as an appeal bond, securing payment of the judgment. Thus, specific performance against all interests in the Property, including that of the children, was, and remains, available.

## II

■ Totah also argues that the Leets have failed to preserve their claim of trial court error for appellate review. Totah's analysis is that the error lies in the circuit court's having instructed the jury to disregard the Remedies Limitation Clause and that the lack of preservation lies in the

absence of any post charge exception to that instruction, when it was given prior to the receipt of evidence and after the close of the evidence. Maryland Rule 2–520(e).

Our review of the procedural history of this action reveals that the erroneous interpretation of the Remedies Limitation Clause came into the case as a result of Totah's oral motion in limine, made two days before trial started, that the clause be ruled out of the case. That issue was fully argued, and the Leets' position was fully stated. On the first day of trial the same issue arose, and the same arguments were repeated, prior to proceedings before the jury, again during the defense's opening statement, and again following the luncheon recess. The instruction to the jury, requiring it to abide by the erroneous ruling, had the same effect as if the court, over objection, had redacted the Remedies Limitation Clause from the copy of the contract introduced into evidence. Under the circumstances here, the claim of error is preserved. *See Prout v. State*, 311 Md. 348, 355–57, 535 A.2d 445, 448–49 (1988); *Turgut v. Levine*, 79 Md.App. 279, 284–88, 556 A.2d 720, 722–24 (1989); *Hickman v. State*, 76 Md.App. 111, 114–18, 543 A.2d 870, 872–74 (1988).

## III

For all of the foregoing reasons, the judgment below will be reversed. It is clear, however, that the erroneous construction of the Remedies Limitation Clause substantially altered the entire course of the proceedings. Based upon that ruling, Totah elected to pursue expectation interest damages and withdrew his requests for specific performance relief that appeared as the second prayers for relief in Counts I and II of the consolidated amended complaint. We cannot reverse the ruling and vacate the judgment without relieving Totah of the effect of that election. On the remand which we order, further proceedings will be based on the consolidated amended complaint in the form in which Counts I and II included claims for specific performance relief.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY REVERSED. CASE REMANDED TO
THE CIRCUIT COURT FOR MONTGOMERY COUNTY
FOR FURTHER PROCEEDINGS CONSISTENT WITH
THIS OPINION. COSTS TO BE PAID BY THE APPEL-
LEE.

## ON MOTION FOR RECONSIDERATION

■ In *Leet v. Totah,* 329 Md. 645, 620 A.2d 1372 (1993),
we held that the only viable claim of the plaintiff-purchaser,
Sami Totah (Totah), was for specific performance. We
reversed a money judgment in favor of Totah that had been
based on a jury verdict awarding benefit of the bargain
damages, and we relieved Totah of his election of contract
damages over specific performance. Our mandate remand-
ed for further proceedings consistent with this Court's
opinion.

Totah thereafter filed a "Motion for Reconsideration and
Clarification of Opinion" in which Totah submits that the
further proceedings should consist only of fashioning an
appropriate decree of specific performance. Harry M. and
Helen A. Leet (the Leets), vendors, oppose that motion.
They assert that the jury verdict has no effect in the
subsequent proceedings and that issues peculiar to specific
performance must be fully litigated as well. Compounding
the lack of any agreement between the parties on the
procedure to be followed is the fact that the judge who
presided at the jury trial died during the pendency of this
appeal.

Here, questions of fact that were necessary for resolution
of the claim for breach of contract damages were submitted
to, and decided by, the jury. One or more of those issues
also may be relevant to the claim for specific performance,
asserted as the sole claim in the subsequent proceedings
(hereinafter, "common issues"). The jury verdict has not
decided common issues for the subsequent proceedings.
"[I]f all claims are equitable in nature, the entire case is

decided by the court." P. Niemeyer & L. Richards, *Maryland Rules Commentary* 156 (2d ed. 1992); *cf. Higgins v. Barnes,* 310 Md. 532, 530 A.2d 724 (1987) (where counterclaim asserting claims at law is filed to complaint seeking specific performance, and counterclaimant demands jury trial, common factual issues are tried to the jury).

*Hyde Properties v. McCoy,* 507 F.2d 301 (6th Cir.1974), is on point. The action was one in the nature of interpleader, and the issue was whether the transfer by a corporation to one of its shareholders of certain assets should be set aside as a fraudulent conveyance. The district court jury found that the corporation was solvent at the time of the transfer and that the conveyance was not fraudulent. Subsequent to the verdict the district court judge concluded that the issues were not triable of right to a jury. The judge redetermined the facts and directed that the contested fund be paid to the challenging creditor. On appeal the Sixth Circuit, after agreeing that there was no constitutional right to a jury trial in the action, then said:

"Because no right to jury trial existed, the jury empanelled by the district court was, in effect, an advisory one. *See* Fed.R.Civ.P. 39(c). Since it is within the discretion of the trial court to accept or reject the verdict of an advisory jury, it can by the same token disregard the jury's responses to the interrogatories."

*Id.* at 306. The appellate court then reviewed the district judge's findings.

Under the Maryland Rules of Procedure, the role of the trial judge in an action seeking only specific performance excludes any jury participation. Maryland Rule 2–511(d) provides that "[i]ssues of fact not triable of right by a jury shall be decided by the court and may not be submitted to a jury for an advisory verdict."

Nor can this Court act as an original fact finder and determine how any common issues should be decided. One commentator has given the following explanation of how appellate courts approach the problem:

"If [appellate courts] merely accept the jury verdict when the weight of the evidence is such that neither a directed verdict nor a new trial would be appropriate if the issues involved were 'legal,' the essential element of a nonjury trial, an independent judgment by a court, has been denied. Even if the appellate court should look at the evidence anew and render an independent decision, it is doing so without being able to gauge the demeanor of witnesses, something the trial judge would be able to do. Although historically, oral testimony before the judge or chancellor was not usually relied upon in equity proceedings, prior to merger equity courts were beginning to hear oral testimony and the factor of demeanor did attain some significance. Therefore, appellate review which does not restore this opportunity impairs the premerger right to a nonjury trial.

"Most courts, apparently recognizing these difficulties, remand the case to the trial judge with instructions to make independent findings of fact."

Note, *The Right to a Nonjury Trial,* 74 Harv.L.Rev. 1176, 1185 (1961) (footnotes omitted).

The added complication in the instant matter is that we cannot remand for independent fact-finding on any common issues by the judge who presided at the jury trial. Maryland Rule 2–536 addresses the disability, including death, of a trial judge. It provides:

"If, by reason of termination of office, absence, death, sickness, or other inability to act, a judge is unable to perform an act or duty in an action, any other judge authorized to act in that court may perform the act or duty if satisfied that he or she can properly do so. Otherwise, the other judge shall grant a new trial or such other relief as justice requires."

Accordingly, on remand, another judge assigned to this action will have to hear and decide, absent agreement between the parties, those additional issues, peculiar to specific performance, that were not adjudicated in the jury trial. Further, the successor judge will have to review the

record in the jury trial. The successor judge should grant a new trial, unless that judge is "satisfied that he or she can properly" determine the common issues relying only on the prior record. If the successor judge is so satisfied, that judge may determine the common issues based on the prior record. That latter decision, if supported by the evidence, may be either consistent or inconsistent with the jury's verdict.

When evaluating whether "he or she can properly" independently determine the common issues based on the jury trial record, the successor judge will necessarily be mindful of the admonition found in Niemeyer & Richards, *supra*, at 420, where the authors state:

> "A judge who succeeds to the performance of a prior judge must determine in each instance whether he or she is able, both legally and factually, to succeed the prior judge. If not, the proceeding must begin anew. For instance, if a judge is the trier of fact and has presided for a substantial portion of the trial, it is virtually impossible for another judge to continue the case over the objection of one of the parties. The first judge's opinion about the credibility of witnesses cannot be transferred to a successor judge. Substitution is no more feasible than substituting a new juror in the middle of trial. A party is entitled to have the same fact finder sit throughout a trial."