STRALEY ET UX. *v.* OSBORNE ET AL.

[No. 381, September Term, 1970.]

*Decided June 7, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Thomas L. Hennessey* for appellants.

*Charles B. Keenan, Jr.,* and *Brodnax Cameron, Jr.,* with whom were *John E. Clark* and *Donald G. Smith* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

In this appeal, we are concerned with an action by a lessee in which he seeks to have the sale of the leased premises to a third party for value set aside and also seeks to obtain specific performance of his first option to purchase that property.

On December 14, 1956, Wilbur F. Haugh (Haugh) sold to Charles Straley (Straley) a junkyard business known as Harford County Auto Parts, Inc., which was located on Route 1 near Fallston, Maryland. On the same day, Haugh leased to Straley the property on which the junkyard business was being conducted. The lease was for a five year period beginning December 1, 1956, and ending November 30, 1961, at a rental of $6,000 per year payable at the rate of $500 per month. The last two paragraphs of the lease provided for renewal of its terms for an additional five year period and also gave Straley the "first option of purchasing" the property. These two

paragraphs are the source of most of the difficulty between Straley and the other parties, and deserve study in some detail:

> "8. It is further agreed by the parties hereto that the Lessee [Straley] is hereby given the privilege of renewing the aforesaid Lease within ninety (90) days of the termination of the term every five (5) years for an additional five year period at a rental commensurate with current market value; the Lessee shall notify the Lessor of any renewal of the Lease in writing, and, if the option is exercised by the Lessee, the renewal Lease shall be in writing for an additional term of five (5) years upon the same terms, conditions and covenants as are contained in this Lease.

> "9. During the five-year term of this Lease and during any renewal term thereafter the Lessee shall have the first option of purchasing this property at current market value at the time of the exercise of the option should the Lessor, WILBUR HAUGH, his heirs, assigns or personal representatives, decide to sell said property. The terms and covenants of this Lease will be binding on the heirs, assigns and personal representatives of the parties hereto."

The lease contained no metes and bounds description of the property in question, but the testimony at trial indicated that Straley, as lessee, occupied approximately seven acres of a ten acre tract owned by Haugh. The other three acres contained a used car lot operated by Cadillac Jack Enterprises, Inc., a corporation solely owned by Haugh.[1] A high wooden fence separated the two businesses.

---

1. It appears that the ten acre tract was the subject of unique zoning. The three acres on which the used car lot was situated were zoned commercial or industrial, while the seven acres were specially zoned for a junkyard, one of very few areas in Harford County so zoned. Additionally, the Harford County zoning ordi-

By 1958, Haugh's used car business was apparently failing, and on January 29, 1958, he conveyed the entire ten acre tract to his corporation, apparently without consideration and without Straley's knowledge, although Straley admitted having paid the rent to Cadillac Jack Enterprises, Inc. from March 8, 1958, until December 9, 1958, at Haugh's direction.[2] Straley continued possession under the lease for his initial term, and gave notice by registered mail in August, 1961, of his intention to renew the lease for a five year period, pursuant to the provisions of paragraph 8 set out above.

On October 18, 1963, Haugh listed the entire ten acre tract for sale at $135,000. There was testimony by Mrs. Verl J. Edwards (Mrs. Edwards), the real estate agent handling the sale, that Haugh wanted to sell the property to "clear various indebtedness" and that there were judgment and mortgage liens in excess of $100,000 on the property at the time it was first listed. Her testimony further indicated that Straley was initially contacted about buying the property on October 25, 1963, at which time he informed her that he was "not interested in buying," was "not making any money," and that he felt that the asking price was "utterly ridiculous." Straley denied this in his testimony. Mrs. Edwards also testified that during the eighteen months after October, 1963, her company advertised the entire ten acre tract by means of posted signs and newspaper advertisements, showed the property at least 100 times, and that she called on Straley "no less than ten times in person," but that "each and every time" he was "in no way interested in buying

nance lists junkyards as a conditional use requiring approval of the Board of Appeals of Harford County. The testimony of Mr. Mervin G. Thompson, Zoning Inspector for Harford County, established that the nearest area which could potentially house a junkyard was twelve to fourteen miles from the subject property, and that only one application for a junkyard had been approved by the Board since 1957. This serves to explain somewhat Straley's desire to insure his continued occupancy of the leased premises.

2. As of December 9, 1958, rent was paid by Straley, through his attorney, to Haugh's attorney.

the property" because he "was not making any money" and "didn't feel it was worth the money."[3] On cross-examination, Mrs. Edwards admitted that she never offered to sell Straley the seven acres which he was occupying, that she "had no authority to offer anything but the entire property," and that sale of the seven acres would have been a "human impossibility" and a "merry mess," apparently because of Haugh's financial difficulties.

On January 18, 1965, Winton B. Osborne (one of the appellees) made an offer to buy the entire ten acre tract for $80,000. On January 28th or 29th, he signed a contract to purchase the property. The following day, Mrs. Edwards purportedly sent a letter to Straley advising him of a bona fide offer of $80,000 and informing him that "if he wished to exercise his first right of refusal, that he now had the opportunity." She testified that the letter was sent by certified mail and that she had a receipt signed by either Straley or his son, but that she did not have it with her at trial. No copy of the letter was introduced into evidence.

Not having received any reply to her letter, Mrs. Edwards telephoned Straley on the evening of March 1, 1965. At this time, Straley notified her that he was not interested in buying from either her or Haugh, and that he would deal only through Haugh's attorney.[4]

In the interval between the time that Osborne signed the contract in late January and Mrs. Edwards made her telephone call to Straley on March 1st, matters did not lie dormant. Mrs. Edwards had presented Osborne's offer of $80,000 to Haugh, who initially refused it. She also had gone to all of Haugh's creditors and succeeded

---

3. Straley put the number of visits from Mrs. Edwards at "about three or four."

4. Straley testified that on every occasion Mrs. Edwards visited him, he told her that he would deal through Mr. Haugh's attorney, and that it was not limited only to the March 1st telephone call. He further testified that he had had all of his dealings with Haugh through their respective attorneys because of trouble between the two parties. See also, footnote 1, supra.

in getting them to reduce their claims (totalling over $100,000) so that clear title to the ten acres could be conveyed by a sale for $80,000. On February 10th, Haugh accepted the $80,000 offer and signed the contract. Mrs. Edwards testified that Osborne knew of Straley's rights in the leased portion of the property when he signed the contract, and that, had Straley indicated when she telephoned him on March 1st that he wanted to purchase the property, she would have refunded the deposit which Osborne had placed and drawn a contract for Straley.

Upon learning that Osborne had placed a deposit on the property, Straley notified his attorney. On March 30, 1965, Straley's attorney wrote to Haugh's attorney and stated that Straley was prepared to offer $35,000 for "the property" (apparently referring to the leased portion) if he could get proper financing. Haugh's attorney wrote back the next day, and in a somewhat abstruse letter, appeared to suggest that a price of $55,000 would be more appropriate.[5] On April 7th and 14th, Straley's attorney sent rental checks to Haugh's attorney and stated that he would like to get together "sometime next week" or "sometime soon" to discuss further the sale of the property and the purchase price, but made no further offers.

On April 14, 1965, settlement was held between Haugh and the Osbornes (Mr. and Mrs.). On two occasions subsequent to the closing, Straley's attorney wrote to the Osbornes' attorney and attempted to exercise Straley's rights to purchase the leased portion, again making offers of $35,000. These were rejected.

The appellants (Straley and his wife) brought suit in August, 1965. In their amended bill of complaint filed November 7, 1966, they asked that the sale from Haugh to the Osbornes be set aside and that Haugh, or in the alternative the Osbornes, be required to specifically per-

---

5. The specifics of the letter are confusing; there apparently is no confusion about the fact that the letter rejected the offer of $35,000.

form the provisions of the lease and convey title to the leasehold property to the Straleys upon payment of the current market value. Judge Harry E. Dyer, Jr., after hearing testimony, rendered an opinion dated July 24, 1970, and ruled that Straley had the "first option of purchasing the property at current market value," that he had the option of "matching the offer for the purchase of the property made by * * * Osborne, and that he had the right to take part in negotiations for the purchase of the property if he so desired." Because Straley failed to do any of those things, Judge Dyer ruled that Straley "failed to prove his case," and signed a decree August 17, 1970, dismissing the bill of complaint. For the reasons which follow, we affirm that decision.

The first issue which must be discussed is whether Straley had any rights in the property in 1965. Paragraph 8 of the lease gives Straley the right to renew for a five year period "at a rental commensurate with current market value" if he gives written notice of his intention to renew. The paragraph also provides that the renewal lease is to be in writing. Straley gave written notice of his intention to renew, but the renewal lease was never reduced to writing and there was never any new rental determined. Haugh and the subsequent lessors accepted the original rental throughout the years. In such a situation, it is clear that Straley was at least a holdover tenant, and it has been held that the holdover tenancy is on all the terms and conditions of the original lease, including the option to purchase, which can be exercised during the holdover period, unless a contrary intention is shown. *Caplan v. Goldstein,* 232 Md. 552, 554, 194 A. 2d 622 (1963) ; *Bagley v. Clark,* 190 Md. 223, 225, 57 A. 2d 739 (1948) ; *Gressitt v. Anderson,* 187 Md. 586, 591, 51 A. 2d 159 (1947). In the case at bar, paragraph 9 of the lease specifically provided that Straley's "first option" was to continue "during any renewal term." Accordingly, whatever rights Straley enjoyed under the terms of his lease continued during the period of the

holdover tenancy, and were operative during the time period in question.

Next comes the question of what rights or interest Straley possessed by virtue of the provisions of paragraph 9 of the lease. That paragraph provides that Straley had the "first option of purchasing" the property "should the Lessor * * * decide to sell said property." Judge Dyer termed his a "right of first refusal" rather than an option, relying on *Westpark, Inc. v. Seaton Land Co.*, 225 Md. 433, 171 A. 2d 736 (1960).

An option has been defined by this Court as:

> "* * * a continuing offer to sell during the duration thereof which on being exercised by the optionee becomes a binding and enforceable contract. * * * And when the optionee indicates an intention to exercise the option and tenders the amount of the purchase price, he has performed under the option and is entitled to specific performance." *Diggs v. Siomporas,* 248 Md. 677, 681, 237 A. 2d 725 (1968).

The distinguishing features of an option are that it is a continuing and irrevocable offer by the optionor, which cannot be withdrawn by him during the stated period. The optionee has what is usually termed a power of acceptance, and when he accepts the offer in the prescribed manner, the option is thereby exercised and creates a binding bilateral contract. *Diggs v. Siomporas, id.; Schlee v. Bryant,* 247 Md. 689, 694, 234 A. 2d 457 (1967) ; 1A *Corbin on Contracts* (1963 ed.), §§ 259, 260; 1 *Williston on Contracts* (3rd. ed.), §§ 61A, 61B, 61C, 61D. And, if the 9th paragraph of the lease in question had created a true option, Straley could have required Haugh to sell the property at any time during the period of the lease. However, in order to do this, he would have had to signify his acceptance in a timely and unequivocal fashion. *Katz v. Pratt Street Realty Co.,* 257 Md. 103,

118, 262 A. 2d 540 (1970); *Foard v. Snider*, 205 Md. 435, 446, 109 A. 2d 101 (1955).

On the other hand, if there exists what has been termed a right of first refusal, a first option, conditional option, or first privilege of purchase, Straley's right is conditional. Professor Corbin describes these rights as "closely related [to options] with respect to the purposes for which they are made and yet are very dissimilar in the legal relations of the parties who make them." 1A *Corbin on Contracts* (1963 ed.), § 261. See also 49 Am.Jur.2d, *Landlord and Tenant*, § 368; 51C C.J.S., *Landlord and Tenant*, § 88(2). And, this Court has recognized a first right of refusal in *Westpark, Inc. v. Seaton Land Company*, 225 Md. 433, 449, 171 A. 2d 736 (1960). In that case, there existed what was specifically termed a "right of refusal," requiring the owners of the property to give the holder of the right of refusal notice if the owners decided to sell the property. The holder of the right then had seven days to accept the owners' terms before the owners could sell the property to anyone else. In *Westpark*, Judge Sybert, writing for the Court, recognized that the instrument in question created a "right of refusal," which was further described as "an equitable right." *Westpark, Inc. v. Seaton Land Co., supra*, at 449-450.

In *Westpark*, as in the case at bar, the holders of the "right" possessed no absolute power to require the property owner to sell at any time—in both instances, whatever rights they had were conditioned upon the owners' decision to sell the property. In neither case did the instrument create a continuing or irrevocable offer by the owner of the property to sell. And, Straley could not have created a binding contract merely by exercising his "option" to purchase. His was specifically termed a "first option," and was conditional upon Haugh's decision to sell. And irrespective of the problems which are created by combining the word "option" with conditional terms such as "first," a reading of the instrument as a whole

leads to the conclusion that Straley held something other than a true option.[6] According to the terms of the lease, Straley only had the right, by whatever name designated, of having the first opportunity to purchase the demised property in the event that Haugh decided to sell. This being so, it was incumbent upon Haugh to notify Straley of his intention to sell so that Straley could then decide whether or not to exercise his "first option of purchasing."

This leads to the next issue to be resolved, namely, the effect on Straley's right of Haugh's inability or unwillingness to offer the seven acre tract for sale. The factual situations in which the question has arisen have varied, but certain principles can be gleaned from the cases and are discussed in the annotation appearing at 170 A.L.R. 1068 (1947). First, it is generally held that, when a lessor receives an offer for purchase of a larger tract which includes the leased parcel, the lessee holding the first option to purchase cannot require the lessor, by means of specific performance, to convey to him the leased portion alone.[7] The reasoning of such cases is that the contemplation (or even the acceptance) by the lessor of an offer for the larger tract is no manifestation of an intention on his part to sell the smaller (leased) portion separately. *Aden v. Estate of Hathaway,* 427 P. 2d 333, 334 (Colo. 1967) ; *Guaclides v. Kruse,* 170 A. 2d 488, 493 (N. J. Super. 1961) ; *New Atlantic Garden v. Atlantic Garden Realty Corp.,* 194 N.Y.S. 34, 40 (App. Div. 1922),

---

6. In reaching this conclusion, we are mindful of the fact that less than five years ago we termed an agreement somewhat similar to the one in the instant case an "option agreement." However, in that case the question was whether the provisions of the agreement survived the optionor, and the issues present in the instant case were not there considered, so that the distinction was not important. See Ensor v. Wehland, 243 Md. 485, 487-490, 221 A. 2d 699 (1966).

7. There are a few decisions to the contrary. See Brenner v. Duncan, 27 N. W. 2d 320, 322-323 (Mich. 1947); Wilson v. Brown, 55 P. 2d 485, 486, 487 (Cal. 1936). However, these cases are recognized as representing a distinctly minority viewpoint, and arose in factual situations where it was obvious that the lessor had sold the property without giving the lessee any notice whatsoever.

*affd.* 143 N. E. 734 (N.Y. 1923). Cf. *Anderson v. Armour and Co.,* 473 P. 2d 84, 89 (Kan. 1970). We are of the opinion that these cases represent the better-reasoned decisions, and it therefore becomes apparent that Straley cannot compel Haugh to sell the seven acres to him by virtue of the fact that Haugh accepted an offer for the ten acre plot from the Osbornes.[8]

On the other hand, the lessor cannot act in derogation of the lessee's "first option" rights in the leased premises, and accordingly it has been held that the lessee may prevent a sale of the leased premises without regard to his rights by means of injunction. *Guaclides v. Kruse, supra,* at 494-495. If a sale is made in violation of the lessee's rights, a subsequent purchaser with actual or constructive notice of these rights takes subject to them. *Guaclides v. Kruse, supra,* at 496, *Atlantic Refining Co. v. Wyoming Natl. Bank, supra,* footnote 8, on 724. And this is as it should be, for to rule otherwise would be to allow a lessor to render the lessee's bargained for "first option" a nullity by merely including it in a larger tract being offered for sale. There is no question in this case that Straley had a first option on the seven acres, that they were in fact sold to the Osbornes as part of the ten acre tract, and that the Osbornes had actual knowledge of Straley's rights. The question then becomes whether or not the sale was made in derogation of those rights.

One of the primary purposes of a provision such as that with which we are concerned in the instant case is to protect the lessee's interest in the continued possession of his premises by affording him the opportunity to purchase the property before anyone else does. In order that the lessee's interests be adequately protected, it is essential that he be given notice of the lessor's desire to sell. Straley correctly states that he was never offered

---

8. Similarly, it is also generally held that the lessee cannot compel the lessor to sell him the larger tract (e.g., ten acres) because the lessee's "first option" applied only to a portion of that tract (e.g. the leased seven acres). Atlantic Refining Co. v. Wyoming National Bank, 51 A. 2d 719, 722-723 (Pa. 1947).

the opportunity to purchase the seven acre leased tract alone, and maintains that this constitutes a fatal variance with the provisions of the lease by Haugh. However, we think the testimony clearly indicates that Straley was well aware that Haugh was contemplating a sale of his property, including the seven acres leased by Straley. Straley admitted as much on cross-examination. Given the extensive efforts which were being made to sell the property, including a minimum of three or four personal visits to Straley by Mrs. Edwards, there can be no doubt that Straley was aware that a sale was being attempted. This being so, the primary purpose of Straley's first option, namely, to give him notice and the opportunity to protect his interests, was certainly achieved. The fact that Straley was not offered the seven acres separately is beside the point. Indeed, as noted earlier, he could not have compelled Haugh to sell him the seven acres. The important point is that the effect of all the activity which took place was to give Straley notice that his interests in the seven acres might be in jeopardy, and that he had best take steps to protect those interests, which is what the first option was designed to accomplish.

Once notice was received by Straley of the contemplated sale, it then became incumbent upon him to take some affirmative course of action. He could have made a good faith effort at entering negotiations with Haugh or Mrs. Edwards, or suggested some method of determining "current market value" so as to arrive at a purchase price. He may even have brought suit to enjoin the proposed sale. Instead, he largely chose to ignore the obvious, and to do nothing. For whatever reason, he failed to make any attempt to purchase his seven acres or the ten acres during the eighteen months that the property was on the market. Only when the sale was completed did Straley do anything, then making an offer amounting to $5,000 per acre for the seven acres of leased property in the face of an existing offer of $80,000 for the entire ten

acre tract. When that offer was rejected, the extent of Straley's efforts were two letters by his attorney offering to "get together" to discuss the sale of the property —hardly the actions of a party sincerely interested in preventing a sale of property leased by him.

Once Straley had received notice of the efforts being made to sell the property of which the seven acres he leased was a part, the purpose of his first option, under the facts of this case, was satisfied. The notice put him on the alert to take positive steps to negotiate a purchase in good faith, if nothing more, and this he failed to do.

There remains only the question of the effect which Haugh's transfer to Cadillac Jack Enterprises, Inc. in 1958 had on Straley's rights under the lease. His first option to purchase was to come into being if and when the lessor decided to *sell* the property. Haugh's transfer of the property without consideration to a corporation wholly-owned by him was not a "sale" as contemplated by paragraph 9 of the lease, *Kroehnke v. Zimmerman,* 467 P. 2d 265, 267 (Colo. 1970) ; *cf. Eastern Shore Trust Co. v. Lockerman,* 148 Md. 628, 636, 129 A. 2d 915 (1925), and the transferee who had knowledge of the option was bound by it. Thus, that transfer has no effect on the outcome of this decision.

*Judgment affirmed; appellants to pay costs.*