ESCA OF BALTIMORE, LLC, Plaintiff

v.

Douglas R. COLKITT, M.D., et al., Defendants.

No. CIV. JFM–00–1733.

United States District Court, D. Maryland.

Sept. 25, 2001.

Irwin H. Liptz, Harlan L. Weiss, Kivitz and Liptz, Chevy Chase, MD, for Plaintiff.

Andrew D. Levy, Andrew David Freeman, Dana Whitehead McKee, Brown, Goldstein and Levy, LLP, Baltimore, MD, Jeffrey L. Tarkenton, Erik david Bolog, Womble, Carlyle, Sandridge and Rice, Washington, DC, for Defendants.

Charles Michael Tobin, Hopkins and Sutter, Washington, DC, for Michael G. Bromley.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff ESCA of Baltimore, LLC ("ESCA") has brought suit against Douglas R. Colkitt, M.D. ("Colkitt") and Medtrend Health Systems, Inc. ("Medtrend") for alleged breach of a right of first refusal provision regarding the sale or transfer of shares of the Eye Surgical Center Associates of Baltimore, LLC (the "Center"). Since ESCA learned of the alleged breach, it has withheld from Colkitt the distributions to which he, as a shareholder of the Center, would otherwise be entitled. ESCA seeks to have this Court declare null and void the alleged transfer of Colkitt's interest in the Center to Medtrend, order Colkitt to comply with the right of first refusal provision, and settle the issue of distributions withheld from Colkitt ac-cordingly. For the reasons discussed below, I am denying both parties' motions for summary judgment.[1]

### I.

ESCA is a limited liability company located in Towson, Maryland and formed for the purpose of providing ophthalmologic services. Colkitt is a citizen and resident of the State of Florida. ESCA and Colkitt entered into an operating agreement (the "Agreement") on November 21, 1994 to form the Center to provide ophthalmologic services. The Agreement sets forth the parameters for the parties' joint operation of the Center. Under the Agreement, ESCA and Colkitt (who each possessed a fifty percent interest in the Center) would each receive distributions of one half of the Center's profits or be allocated one half of the Center's losses every fiscal year.

Article 8 of the Agreement contains two provisions regarding the sale or transfer of a member's interest in the Center that are germane to this case. First, Paragraph 8.1 describes the right of first refusal that both Colkitt and ESCA possessed. Because the right of first refusal is central to the disposition of this case, I quote it in its entirety:

> In the event either Colkitt or [ESCA] wishes to *sell or transfer their ownership interest in [the] Center to a bona fide purchaser* whose ownership of [the] Center would be consistent with Maryland law, the potential transferring Member shall notify the other member in writing of its intention to so transfer. Such written notice shall contain, at a minimum, *the identity of the potential purchaser and the tendered purchase*

---

1. Defendants have also moved to strike section IV of plaintiff's reply to defendants' opposition to plaintiff's cross motion for summary judgment. Because I do not rely on section IV of plaintiff's reply in my determination to deny both parties' motions for summary judgment, defendants' motion to strike is denied.

*price.* The Member so notified shall then have thirty (30) days to elect to meet the bona fide purchase price and purchase the ownership interest at issue. Should such an election be made, the purchase shall be completed within the later of sixty (60) days of notification of said election, or upon the same date on which the original purchaser intended to close on the transaction.

(Def.'s Mot. for Summ. J., Ex. A, Operating Agreement, ¶ 8.1.) (emphasis added).

Paragraph 8.4 addresses what would happen if Colkitt were to die or become disabled. It allows Colkitt's estate or legal representative to appoint another individual, who meets the licensure and other requirements, to replace Colkitt as a Member under the Agreement.[2] The replacement proposed by Colkitt's estate or legal representative would be subject to ESCA's approval.

Medtrend is one of more than one hundred corporations and partnerships in which Colkitt holds a significant ownership interest. Medtrend is a Delaware corporation that provides management services to free-standing ambulatory surgical centers. Colkitt has been a shareholder in Medtrend since its incorporation in 1992. In 1997 and 1998, Colkitt held a 20% interest in Medtrend. The remaining interest in Medtrend was held 20% each by Colkitt's family members, Robert Colkitt, Marcy Colkitt, Ed Russell, Sr., and Ed Russell, Jr. In 1999 and 2000, it appears that Colkitt and his wife owned 33a% of Medtrend's stock, Robert and Mary Jean Colkitt owned 33a% of Medtrend's stock, and Marcy and Paul Castro owned 33a% of Medtrend's stock.

In 1995, the Center contracted with Medtrend to act as the Center's "exclusive business manager and to provide, arrange for the provision of, the office facilities, services, supplies, equipment and personnel necessary to operate [the Center's] business." (Def.'s Mot. for Summ. J., Ex. B, Management Agreement, § 2.) Accordingly, Medtrend is responsible for the day-to-day management of the Center. From 1994 until 2000, Medtrend employed Marcia Cafferty and her husband, Michael Bromley. Although their positions are not clearly identified in the record, it appears that Cafferty and Bromley were managers of Medtrend and involved with the Center.

According to Colkitt, he and Medtrend entered into negotiations with Cafferty and Bromley in 1997 or 1998 regarding their employment compensation agreement with Medtrend. The discussions included the possibility that Cafferty and Bromley would receive Medtrend stock, and that Colkitt would convey his ownership interest in the Center to Medtrend. The negotiations broke down and no subsequent transfer was ever effected.

Trident International Management Services, Inc. ("Trident") prepared the Center's 1996 federal tax return (U.S. Partnership Return, Form 1065), which indicates that the Center was owned fifty percent by Colkitt and fifty percent by ESCA. The Center reported $577,073.00 in ordinary income for 1996. Colkitt signed the return. Colkitt's individual tax return for 1996 reflects that he received $288,536.00 in income from the Center that year—fifty percent of the Center's ordinary income reported in 1996. Colkitt did not use a paid tax preparer for any of his individual tax returns.

Trident prepared the Center's 1997 federal tax return as well. It is unclear whether the tax return in the record for

---

2. Alternatively, Paragraph 8.4 permits Colkitt's estate or legal representative to exercise the mutual buy/sell option described in Paragraph 8.2.

1997 is the original tax return or an amended tax return. Colkitt avers that Exhibit F contains the Center's original 1997 tax return. (Def.'s Mot. for Summ. J., Ex. F.) That 1997 return indicates that the Center was owned fifty percent by Colkitt and fifty percent by ESCA. Colkitt signed the return. The Center reported $814,479.00 in ordinary income on the return. Strangely, Exhibit E contains, among other things, a letter informing the IRS that the 1997 return erroneously listed Medtrend as a partner and that an enclosed amended return corrected the partner's name to Colkitt. (Def.'s Mot. for Summ. J., Ex. E.) It seems unusual to write and sign this letter to the IRS seeking to amend the tax return if, in fact, the original tax return showed that Colkitt and ESCA owned the Center. Colkitt's individual tax return for 1997 reflects that he received no income from the Center. Medtrend's 1997 tax return, on the other hand, reflects that its five shareholders received $407,240.00 in income from the Center—fifty percent of the Center's reported ordinary income for 1997. The Medtrend return was prepared by Trident and signed by Colkitt.

Trident prepared and Colkitt signed the Center's 1998 return, which indicates that the Center was owned fifty percent by Medtrend and fifty percent by ESCA. The Center reported $932,211.00 in ordinary income. Medtrend's 1998 return, again prepared by Trident and signed by Colkitt, reflects that its five shareholders received $466,105.00 in income from the Center— fifty percent of the Center's reported ordinary income for 1998. Colkitt's individual tax return for 1998 is not in the record.

William C. Saddler, C.P.A. ("Saddler") prepared the Center's tax return for 1999. Saddler requested and received copies of the Center's tax returns for previous years. Ronald McFarland ("McFarland"), presi-dent of Trident at the time, instructed Saddler to model the Center's 1999 tax return after the 1998 return. Thus, Saddler prepared the 1999 return to indicate that the Center was owned fifty percent by Medtrend and fifty percent by ESCA. Copies of the 1999 tax return and the 1999 K–1s, which Saddler prepared in March, 2000, were sent to McFarland, Bromley and Cafferty, and the doctors' group at the Center. Colkitt avers that he refused to sign the 1999 return first prepared by Saddler because it incorrectly listed Medtrend, not Colkitt, as an owner of the Center. Further, Colkitt asserts that he informed Saddler of the mistake, instructed Saddler to correct it, and then signed the corrected 1999 return that is Exhibit H. (Def.'s Mot. for Summ. J., Ex. H.) Colkitt explains that Saddler erroneously labeled the return "amended," which was a mistake because Colkitt never signed the first return Saddler prepared. Curiously, Saddler indicates that he was only informed of the discrepancy by Marcy Colkitt ("M.Colkitt") in September, 2000. Saddler changed the return shortly thereafter. Also interesting, although Colkitt signed all of the Center's previous returns in March of the year following the year of the return, he did not sign the return allegedly erroneously labeled "amended" until November, 2000.

Shortly after reviewing the Center's 1999 tax return, Cafferty and Bromley wrote a letter to M. Colkitt, Colkitt's sister and the attorney for Medtrend. In the letter, dated March 22, 2000, Cafferty and Bromley raise the issue of the Center's ownership:

> [W]e recently [ ] received the tax returns for Medtrend and the [Center]. Much to our surprise and concern we discovered that the ownership of all entities has changed. Specifically, in 1998 Douglas R. Colkitt's 50% ownership in

the [Center] was replaced by MedTrend (sic) which is, apparently, owned by five individuals since 1997 according to the tax returns.... To whom do we make out distribution checks?

As you are aware, our fiduciary responsibility as managers requires that we inform all partners of significant/material events and changes. Why weren't we notified of this change?

(Pl. Opp. and Counterclaim, Ex. 10.)

After the letter was sent by Cafferty and Bromley, Colkitt conducted a telephone conference among himself, Cafferty, Bromley, Russell, Sr., Russell, Jr., Peter Conalich, and McFarland. When Cafferty and Bromley raised the issue of the Center's ownership, Colkitt was non-responsive—neither confirming nor denying that the ownership had changed. When Bromley and Cafferty told Colkitt that the doctors at the Center should be informed of the ownership change, Colkitt told them to go ahead and inform the doctors if they so desired. When Bromley and Cafferty asked Colkitt what he would like for them to say, he told them to say whatever they wanted to say.

In September, 2000, Saddler received a phone call from M. Colkitt, who said that the Center's 1999 return was wrong and should be amended. A letter from M. Colkitt to Saddler dated September 26, 2000 communicated the same information. In the letter, M. Colkitt also stated, "I would appreciate your advising me who erroneously advised you that Medtrend was a shareholder in [the Center]." In his reply letter, Saddler informed M..Colkitt that the return was prepared pursuant to McFarland's instructions to prepare it in the same manner as it was prepared the prior year. (Pl.'s Mot. for Summ. J., Ex. 9.)

In August, 2000, the Center filed amended returns for 1997 and 1998 "due to a correction in the partner's name from Medtrend Health Systems, Inc. to Douglas R. Colkitt." (Def.'s Mot. for Summ. J., Ex. E.) In September, 2000, pursuant to M. Colkitt's instructions to "immediately correct this error," Saddler prepared a new 1999 return listing Colkitt, not Medtrend, as a partner. Saddler labeled the new return "amended." Colkitt signed the return in November, 2000. The record does not include any Medtrend returns amended to reflect that it did not receive income from the Center in 1997, 1998, or 1999. Nor does the record include any of Colkitt's individual returns amended to reflect that he did receive income from the Center in 1997, 1998, or 1999.

ESCA filed its complaint on June 13, 2000.

## II.

■ Summary judgment is inappropriate in this case because there is a genuine issue of material fact: whether Colkitt transferred his interest in the Center for value. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The right of first refusal clause in the Agreement would have been triggered had Colkitt transferred his interest in the Center for value. If triggered, the right of first refusal gives ESCA the right to purchase Colkitt's interest in the Center. Although the evidence before me strongly suggests that Colkitt transferred his interest in the Center to Medtrend, I cannot be certain that he did so. Less clear is whether he received consideration in exchange for the alleged transfer. Resolution of the defendants' and plaintiff's conflicting accounts will turn on the credibility of Colkitt and possibly several other witnesses. Accordingly, I am denying plaintiffs' and defendants' motions for summary judgment.

### A.

ESCA argues that Colkitt sold his interest in the Center to Medtrend for an unknown sum of money. The strongest evidence ESCA proffers to support its contention are federal tax returns for the Center, Medtrend, and Colkitt. First, the tax returns originally filed for the Center in 1997, 1998, and 1999[3] indicate that the Center was owned by Medtrend, not Colkitt. Second, Colkitt's individual tax return for 1997 indicates that he received no income from the Center, whereas his 1996 return indicates he received fifty percent of the Center's income that year. Third, Medtrend's tax returns for 1997 and 1998 indicate that its shareholders received fifty percent of the income from the Center in both years. The most logical interpretation of these tax returns is that Colkitt sold or transferred his interest in the Center to Medtrend in or around 1997. ESCA additionally points to Colkitt's non-responsive behavior when confronted by Cafferty and Bromley about the transfer as evidence that the transfer occurred.

Colkitt argues that the tax returns do not evidence a transfer because his paid tax preparer simply made mistakes on the tax returns, and he corrected the mistakes as soon as he learned of them. Even though he signed all of the tax returns at issue, he states that the errors slipped past him for two or three years because he is responsible for many tax returns each year.

There is substantial evidence that makes Colkitt's argument unpersuasive. Significantly, Colkitt prepared his own individual tax returns, which show him receiving zero income from the Center in 1997—the same year that the Center's and Medtrend's tax returns show Medtrend receiving a fifty percent distribution of the Center's income. Unlike the paid tax preparers who allegedly erred on the Center's tax returns, Colkitt should have known when he prepared his individual returns that he had not transferred his interest in the Center if he had truly not done so. Moreover, the alleged accounting errors on the Center's 1997, 1998, and 1999 tax returns were not corrected via amendment until the fall of 2000—years after some of the errors were made and several months after the plaintiff filed its complaint.[4] Despite Colkitt's claim that he did not transfer or sell his interest, the record does not include an amended tax return for Colkitt that corrects his omission of any income from the Center on his 1997 tax return. Nor does the record include any amended Medtrend tax returns that correct the inclusion of income from the Center in 1997 and 1998.

In short, ESCA has circumstantial evidence of a transfer by Colkitt, and Colkitt denies that a transfer occurred. The only individuals who could testify directly about the alleged transfer are likely Colkitt and his family members. Resolution of this dispute comes down to credibility—a determination ill-suited for summary judgment.

### B.

Even if the tax returns alone were enough to persuade me that Colkitt did transfer or sell his interest in the Center to Medtrend, that would not be sufficient to determine whether the right of first refusal was triggered. This straight-forward clause states that the right of first refusal is triggered by "sale or transfer to a bona fide purchaser." (Def.'s Mot. for Summ. J., Ex. A, Operating Agreement,

---

**3.** There is some dispute over the content of the originally filed 1997 and 1999 returns. *See* discussion *infra,* pages 4–5.

**4.** *See supra* note 2.

¶ 8.1.) In other words, Colkitt or ESCA must exchange their interest in the Center for some consideration in order to trigger the right of first refusal for the non-transferring party. ESCA reads the clause to mean that the right of first refusal is triggered whenever one sells his interest to a bona fide purchaser or transfers his interest, whether or not for value. ESCA's reading is incompatible, however, with the structure of the clause and the contract as a whole. At a minimum, the order of the words "sale" and "transfer" must be inversed to read "transfer or sale to a bona fide purchaser" to raise the possibility that the sentence could be construed as ESCA reads it. Moreover, the procedure outlined in the right of first refusal clause does not contemplate a transfer not for value. The right of first refusal clause requires that "the potential transferring member shall notify the other member in writing of its intention to so transfer" and include, at a minimum, "the identity of the potential purchaser and the tendered purchase price." (*Id.*) Notably, other provisions in the Operating Agreement outline or invoke a valuation procedure. (Def.'s Mot. for Summ. J., Ex. A, Operating Agreement, ¶¶ 8.2, 8.5.) The omission of any reference to a valuation procedure in the right of first refusal clause further underscores that the right of first refusal is not triggered when a member's interest is transferred as a gift and not for consideration.[5]

Colkitt expends considerable energy arguing that a transfer to an entity he controls would not trigger the right of first refusal. The only Maryland case cited by Colkitt discusses a transfer, not a sale, to a corporation wholly-owned by, not merely controlled by, the transferor. *Straley v. Osborne,* 262 Md. 514, 278 A.2d 64 (Md. App.1971). Even if I were convinced of the importance of control of the transferee entity in the context of a sale, it is not clear that Colkitt in fact controls Medtrend. Colkitt is but one of several owners of Medtrend. He and his wife have possessed between a 20% and 33a% interest in Medtrend. (Pl.'s Reply, Ex. 2–3; Pl. Opp. at 25.) A proxy executed by the other Medtrend shareholders on January 7, 1998, allowing Colkitt to vote their shares of Medtrend, is revocable at any time. (Pl.'s Reply, Ex. 1, Proxy.) Although Colkitt asserts that he is the Chairman of the Board of Directors and sole Director of Medtrend, thus giving him the power under the By–Laws to "manage[ ] and controll[ ]" Medtrend (Def.'s Mot. for Summ. J., Ex. C, By–Laws, ¶ 14), the shareholders of Medtrend possess the power to "amend[ ], alter[ ] repeal[ ], or add[ ] to" Medtrend's By–Laws by a majority vote. (Def.'s Mot. for Summ. J., Ex. C, By–Laws, ¶ 44.)

### C.

Because the right of first refusal is only triggered by a transfer for consideration, ESCA's summary judgment motion is undermined by its inability to identify the consideration Medtrend allegedly exchanged for Colkitt's interest in the Center. Again, the tax returns strongly support ESCA's contention that Colkitt sold or transferred his interest in Medtrend. Colkitt steadfastly denies any transfer occurred, and ESCA has not set forth any

---

5. Arguably, ESCA still has right to withhold its approval of an intervivos transfer in a manner similar to that by which it could withhold its approval of a transfer under ¶ 8.4. The Agreement as a whole would read somewhat illogically if it required ESCA's approval for a transfer of ownership after Colkitt's death but not during his life. I do not further address this issue here, however, as the parties have only discussed the applicability of the right of first refusal clause.

evidence of consideration paid by Medtrend. To some extent, ESCA's lack of evidence of consideration is countered by Colkitt's failure to report transferring his interest as a gift to Medtrend on his individual tax return, as he would have been required to do for a gift of this magnitude. No such gift is reported on his tax return in 1997, despite reporting no income from the Center on Colkitt's 1997 tax return. Still, it is unclear whether the alleged transfer was a gift or a sale.

In light of the genuine and material factual dispute over whether and how Colkitt transferred his interest in the Center, resolution of this conflicting evidence must wait for trial, where the credibility of Colkitt and others may be ascertained by triers of fact. Plaintiff's and defendants' motions for summary judgment are therefore denied.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 25th day of September 2001 ORDERED

1. Plaintiff's and defendants' motions for summary judgment are denied; and

2. Defendants' motion to strike section IV of plaintiff's reply memorandum is denied.