DIAZ, Circuit Judge,
concurring:
Although I share the majority’s view of the outcome of this case, I diverge slightly in my understanding of the nature of the relationship between the parties after the expiration of the Interim Agreement in 2005. I would find that Kinder Morgan was bound by the Lease terms as a holdover tenant, and that the later purchase orders do not supersede the Lease terms in this case because they cover a different subject matter.
The record before the court does not support the conclusion that Kinder Morgan objectively intended to be bound by the terms of the 1992 Lease after the expiration of the final Interim Agreement in 2005. To the contrary, the undisputed evidence suggests that Kinder Morgan specifically did not wish to be bound by the original lease terms because it wanted to negotiate a new long-term agreement in order to invest in capital improvements to the “A” Pier. In fact, when RG Steel’s predecessor proposed a new contract that would have extended the interim period through March 2006, Kinder Morgan refused to sign it. Kinder Morgan’s occasional post-2005 references to the expired Lease do not alter this conclusion, and indeed, some of the references support Kinder Morgan’s assertion that it no longer considered itself bound by the Lease. See, e.g., J.A. 888 (in which Kinder Morgan references “the previous contractual relationship” under the Lease) '(emphasis added).
Nonetheless, Kinder Morgan’s actions are entirely consistent with a holdover tenancy. Importantly, a holdover tenancy under Maryland law is not based on objective assent or intent to be bound by a lease. Rather, it exists automatically when a lessee overstays the term of a leasehold. See Md.Code Ann., Real Prop. § 8-402(c) (West 2015) (“Unless stated otherwise in the written lease ... when a landlord consents to a holdover tenant remaining on the premises, the holdover tenant becomes a periodic month-to-month tenant .... ”). When a tenant holds over, the tenancy remains “on all the terms and conditions of the original lease.” Straley v. Osborne, 262 Md. 514, 278 A.2d 64, 68 (1971).
Despite demonstrating an intent not to be bound by the terms of the Lease in its negotiations with RG Steel’s predecessors, Kinder Morgan undoubtedly remained at Sparrows Point after the final Interim Agreement expired. As the district court observed, it also continued to pay rent, utilities, and wharfage fees to the owners of the property, and it continued to operate and maintain the Bridge Crane. Kinder Morgan also failed to take any of the actions that would have been required upon the expiration of the Lease, including surrendering the property and conducting *744 a final inspection of the Bridge Crane. Based on Kinder Morgan’s behavior, I agree with the district court’s conclusion that the purchase orders alone could not possibly be construed to govern the parties’ relationship. And although Kinder Morgan did not consider itself bound by any agreement with RG Steel’s predecessors, its continued presence at the site and “good faith” adherence to the terms of the Lease is consistent with a holdover tenancy-
Due to the holdover tenancy, the Lease terms remained in force beginning on January 1, 2006, to the extent the parties did not replace those terms with express, written agreements. Among the Lease terms was an entire section dedicated to the Bridge Crane wherein Kinder Morgan and its predecessors agreed to assume “the entire risk of loss, theft, or destruction of the No. 4 Bridge Crane resulting from any cause whatsoever.” J.A. 690. The Lease’s indemnity provision further clarified Kinder Morgan’s liability, stating that it would “indemnify and save harmless” the crane’s owner from any loss or liability resulting from any damages sustained by the owner as a result of any act or omission of Kinder Morgan, “whether negligent or otherwise.” J.A. 692. Undoubtedly, the terms of the Lease directly covered the subject matter of Kinder Morgan’s liability in the event of damage to the Bridge Crane, and did not provide for any limitation on consequential damages.
In February 2008, the parties entered into a purchase order under which Kinder Morgan agreed to unload “up to 500,000 nton of coke from ships with Bridge Crane.” J.A. 992. Delivery of the coke was promised approximately four months later, and the purchase order provided for a delivery location, a unit price, and a total price. The purchase order also made reference to the buyer’s terms and conditions, contained in a document called the AMUSA-100 “General Purchasing Conditions for Purchase of Goods or Services.” The first sentence of the AMUSA-100 clearly states its scope: “These General Purchasing Conditions (“GPC”) shall apply to the purchase of any materials, items, products ... and any related services (“Goods”) offered or provided by suppliers (‘Seller’).” J.A. 997 (emphasis added). The terms of the AMUSA-100 thus explicitly apply to the procurement of specific goods and services, addressing such topics as price adjustments, delivery, inspection of the product, and warranties on the goods exchanged.
Although the “Warranty — Liability” portion of the terms states that neither party will be liable for consequential damages “under this order,” that language is preceded by five sections referring to the nature of the goods delivered under the purchase order, including their quality, performance, and timely delivery. The limitation on liability under the purchase order is narrow in scope: it only covers liability resulting directly from Kinder Morgan’s delivery of goods and services to RG Steel and its predecessors. The purchase order and its accompanying terms do not address Kinder Morgan’s liability in the event that it fails to maintain and protect the Bridge Crane itself, despite the fact that Kinder Morgan was unloading coke at the time of the accident. I would therefore find that because the terms of the Lease were the only manifestation of the parties’ intent with respect to the damages caused by the accident, those terms apply and there is no limitation on Kinder Morgan’s liability.*
*745 Ultimately, I agree with the majority’s view that the terms of the Lease remained in force and continued to govern the parties’ relationship at the time of the accident. Although the parties subsequently entered into written purchase orders, those orders (and their accompanying terms and conditions) addressed a subject matter distinct from the events of this case and thus do not supersede the Lease terms. I therefore join in the majority’s conclusion that Kinder Morgan is liable for consequential damages, and that the district court did not err in relying on Appel-lee’s expert in calculating those damages.

 The majority applies the Lease terms indirectly through the AMUSA-lOO’s “safety valve provision.” But because I do not agree that the limitation on liability in the purchase or *745 der and the indemnity clause in the Lease are "corresponding ... provisions” "in contradiction with” each other, J.A. 997, I conclude that Kinder Morgan's liability for the accident is governed only by the Lease,